**NATIONAL SOCIALIST WHITE PEOPLE'S PARTY et al.,**
**Appellants,**

v.

**Joseph RINGERS, Jr., and Witcher N. Beverly, Appellees.**

**No. 72-1737.**

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 14, 1972.*

Decided Feb. 5, 1973.

NER, Circuit Judges, and MURRAY, District Judge, sitting by designation. By order entered December 19, 1972, a majority of the Court ordered the case resubmitted to the Court in banc on the briefs.

---

* The Honorable Robert H. Schnacke, United States District Judge for the Northern District of California, sitting by designation.

* The case was argued on this date before a panel consisting of WINTER and BUTZ-

James H. Cohen, Washington, D. C. (James R. McCotter, Washington, D. C., and Philip J. Hirschkop, Northern Virginia Civil Liberties Union, Alexandria, Va., and Ralph J. Temple, Washington, D. C., ACLU Fund of the National Capital Area, on brief), for appellants.

Gregory U. Evans, Arlington, Va. (James H. Simmonds, Arlington, Va., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, and WINTER, CRAVEN, BUTZNER, RUSSELL, FIELD and WIDENER, Circuit Judges, sitting in banc.

WINTER, *Circuit Judge.*

The National Socialist White People's Party (the Party) appeals from the district court's order dismissing its suit to compel the Arlington County School Board (the Board) to permit the Party to use Yorktown High School's auditorium for a meeting to be held during non-school hours. The district court premised its ruling on two grounds: (1) the Board properly denied the Party's requests because the meeting would likely result in violence and damage to the facilities; and (2) the Board could not accommodate the Party without involving the state unconstitutionally in the Party's racially discriminatory practices. The Party asserts that the Board's refusal to grant a permit constitutes state action which violates its first amendment right to speech and assembly, and its fourteenth amendment right to equal protection of the laws. We agree with regard to the Party's first amendment rights and therefore reverse the order of the district court.

I.

The facts underlying this controversy have been stipulated by the parties: The Party, a successor to the American Nazi Party, is a non-profit corporation, incorporated in Virginia. A charter purpose of the Party is to gain political power by all legal and non-violent means, including the elective process. Party membership is limited only to whites of any religion who embrace its views. No Negro has ever held membership in the Party.

The Board, an arm of the State of Virginia, has responsibility for schools, grounds, and related property. State law permits the Board to rent high school auditoriums during non-school hours "for any legal assembly," Va.Code Ann. § 22–164 (1969), "as will not impair the efficiency of the schools." §§ 22–164.1, 22–164.2. Pursuant to this statutory authority, the Board has promulgated regulations under which it leases school property to organizations in "good standing." By regulation, an

organization possesses "good standing" if it has "no previous record of abuse of school facilities." The Board has for some time, and on a regular basis, granted permits to use the auditorium to a wide variety of public and private groups on a first-come first-served basis. The Board has granted such permits to organizations which exclude certain racial, religious, or sexual groups. Except for a few instances involving groups which had previously damaged school property, no group has been denied the use of an available auditorium except the Party.

The Board has consistently refused to rent available auditoriums to the Party, although the Party has no previous record of abuse to school property. Thus, in 1959, the Board rejected a Party application without reasons. In 1969, the Board rejected the Party's application to hold a private meeting explaining that custodial help was unavailable. In fact, the Board rented the facility to "Youths for Christ" on the date requested.

On January 30, 1970, the Party applied to use Yorktown High School on March 7, 1970 for a public meeting to which it invited only non-Jewish white persons. Although the Party does not invite Negro and Jewish persons, in fact it will not, and has not, excluded them from public meetings if they seek admission. The Board initially granted the application, then revoked it because the Party planned to exclude these groups and because the Board feared resultant disorder. On the evening of the planned meeting, the Party held a non-violent rally outside the school and later outside the home of the Assistant Superintendent of Schools. The rally occasioned no violence and no confrontation with the police. The police made no arrests outside the school, but did arrest six Party members outside the Assistant Superintendent's home for violating the county noise ordinance.

On April 3, 1970 the Party again applied for a permit to rent the Yorktown High School auditorium, this time to hold a private meeting open only to "card-carrying members and official supporters." The Board denied the application without stating its reasons. The Party then commenced this suit for declaratory and injunctive relief.[1] During discovery, the Board stated that it had denied the April 3 application because of the Party's protest on March 7 and because the Board feared the proposed private meeting would endanger school property and disrupt the tranquility of the community. The district court denied the Party's motion for a temporary restraining order. This court affirmed and remanded for a hearing on the merits. National Socialist White People's Party v. Ringers, 429 F. 2d 1269 (4 Cir. 1970).

Upon remand, the district court sustained the Board's refusal to make the facilities available on the grounds that (1) the Party's proposed meetings would endanger school property, and (2) the state action doctrine required denial of the use of a publicly owned meeting place and auditorium to an organization, political in nature, which practices a racially discriminatory membership policy. We find neither conclusion legally tenable.[2]

1. Since the commencement of this litigation, the Party has thrice applied for a permit to use a school auditorium and has thrice been rejected. The Party applied on May 1, 1970 to hold a private meeting on July 3, 1970. The Board rejected it without stating its reasons. On June 22, 1971, the Party applied to hold a private meeting on August 25, 1971, and a public meeting on September 25, 1971. The Board rejected both applications because it feared disorder and because this litigation was pending. On August 26, 1971, the Board formally resolved that it would never permit the Party to use school facilities.

2. In regard to the Party's claimed denial of equal protection, the parties have stipulated:

Over the past several years, the School Board has granted permit requests to hold both private and public meetings, on a continuing basis, to a wide variety

## II.

■ At the outset, we find lacking in merit the conclusion of the district court that the Board properly denied use of the facilities to the Party because a meeting would be likely to result in violence and damage to the facilities. The record,[3] considered in the light of Collin v. Chicago Park District, 460 F.2d 746 (7 Cir. 1972), will simply not support this conclusion.[4] We turn, therefore, to the issue of application of the state action doctrine. So far as we have been able to ascertain, its possible application here is a question of first impression.

## III.

■■ The Board's repeated exercise of its discretionary authority to rent the Yorktown High School auditorium for a nominal fee during non-school hours to public and private groups for public and private meetings on a first-come first-served basis, to the extent that the auditorium is not needed for school purposes and that non-school uses will not endan-

ger the property, constitutes, in our view, an effective dedication of the auditorium for the exercise of the first amendment rights of freedom of speech, association and assembly. This partial dedication as a forum for the exercise of first amendment rights makes the school auditorium conceptually indistinguishable for first amendment purposes as a "public place" from streets and parks, which too, are acquired and maintained at public expense.[5] There can be little doubt that streets and parks are recognized forums for the exercise of first amendment rights. In Hague v. Committee for Industrial Organization, 307 U.S. 496, 515–516, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939), Mr. Justice Roberts wrote:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and *public*

---

of in-county and out-of-county organizations, *(including to groups whose membership does not include certain racial or religious affiliations)*. Groups which have rented facilities include the Democratic Party, the Republican Party and other political, religious, civic and fraternal organizations . . . . Except for a few instances involving groups which had previously damaged school property during a prior usage, no group has been denied the use of an available facility with the exception of the Party. Uses have included dances, meetings, religious services and a wide variety of other uses (emphasis added).
We are therefore not confident that the Board's regulation does not involve a denial of equal protection of the laws. We do not pursue the question, however, because of our conclusion concerning the first amendment.

3. The parties have stipulated that "[o]ther than the Party's conduct and activities following the revocation of the Party's permit for the March 7, 1970 usage for a public meeting," i. e., a non-violent demonstration resulting in six arrests for violation of a noise ordinance, "the Board knows of no specific event, activity, or

meeting anywhere at or during which the Party has acted violently or illegally or has damaged, or threatened to, public or private property." The demonstration began in front of the school when the school was locked and the Party was denied access. The arrests occurred in front of the home of the Assistant Superintendent of Schools when the demonstration moved there.

4. Even if the record showed some history of violence attendant upon the Party's meetings, or some threat of violence by hostile spectators, it would not constitute a proper basis for restraining the Party's otherwise legal first amendment activity. Gregory v. Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969); *Collin*, supra at 754–755 of 460 F.2d; Hurwitt v. City of Oakland, 247 F.Supp. 995, 1001 (N.D.Cal.1965); Williams v. Wallace, 240 F.Supp. 100, 109 (M.D. Ala.1965). See Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949).

5. Danskin v. San Diego Unified School Dist., 28 Cal.2d 536, 171 P.2d 885, 892 (Cal.1946). See nn. 7 and 11.

*places* has, from ancient times, been a part of the .privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.[6] (emphasis added).

By the same token, we conclude that the school auditorium, since it has effectively been partially dedicated for first amendment uses, may be used for purposes of assembly, communicating thoughts between citizens and discussing public questions. In a public place regularly used for the exercise of free speech and the exchange of ideas, we do not see how walls and a roof can insulate against the reach of the first amendment's commands. That amendment's protections cannot be made to turn on the structural distinctions between, for example, an open public park, a public amphitheatre, a public stadium, or an enclosed public auditorium.[7] While limitations on its use as a forum to permit it to serve its prime function (school purposes), to serve the general comfort and convenience, and to preserve peace and good order, including the protection of property, may be sustained, regulation which limits the exercise of first amendment guarantees should be stricken down.

There is no dispute that the first amendment protects from state interference the expression in a public place of the unpopular as well as the popular[8] and the right to assemble peaceably in a public place in the interest and furtherance of the unpopular as well as the popular.[9] Specifically, the expression of racist and anti-semitic views in a public place and the right to assemble in a public place for the purpose of communicating and discussing racist and anti-semitic views are protected activities and may not be circumscribed by the state, except where "advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969), or where "there are special, limited circumstances in which speech is so interlaced with burgeoning violence that it is not protected by the broad guarantee of the First Amendment," Carroll v. Princess Anne, 393 U.S. 175, 180, 89 S.Ct. 347, 351, 21 L.Ed.2d 325 (1968). Under the stipulated facts, the Party presented no such danger.

Certainly the ability to meet in public places is fundamental to the exercise of

6. Although Mr. Justice Roberts' reliance on the privileges and immunities clause has not found acceptance, his first amendment analysis has often been reaffirmed. See, e. g., *Kunz*, supra; Marsh v. Alabama, 326 U.S. 501, 504, 66 S.Ct. 276, 90 L.Ed. 265 (1946); Thornhill v. Alabama, 310 U.S. 88, 105–106, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Schneider v. State, 308 U.S. 147, 160, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *Collin*, supra.

7. "Censorship of those who would use the school building as a forum cannot be rationalized by reference to its setting. School desks and blackboards, like trees or street lights, are but the trappings of the forum; what imports is the meeting of minds and not the meeting place." *Danskin*, supra at 892 of 171 P.2d.

8. "I do not believe that it can be too often repeated that the freedoms of speech, press, petition and assembly guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish." Communist Party v. SACB, 367 U.S. 1, 137, 81 S.Ct. 1357, 1431, 6 L.Ed.2d 625 (1961); Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266, 283 (1972); *Terminiello*, supra; *Kunz*, supra; Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Thornhill*, supra.

9. *Id.* See cases cited at n. 4, supra. See also United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967).

first amendment freedoms. If the state denies that opportunity to an unpopular group, the first amendment will be substantially emasculated.· The very recent case of Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), held that the first amendment requires a state-supported college to recognize a student political group (SDS) and to afford it the use of campus facilities for communication and association, unless it was shown that the group, in addition to mere advocacy of radical doctrines, would likely "infringe reasonable campus rules, interrupt classes or substantially interfere with the opportunity of other students to obtain an education." 408 U.S. at 189, 92 S.Ct. at 2350, 33 L. Ed.2d at 284. The basis of the Court's reasoning was the inescapable link between the denial of campus facilities for communication and assembly and prior restraint of unpopular ideas. Thus, the Court stressed that: "Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs . . . . There can be no doubt that denial of official recognition, without justification, to college organizations burdens or abridges that associational right. The primary impediment to free association flowing from nonrecognition is the denial of use of campus facilities for meetings and other appropriate purposes." 408 U.S. at 181, 92 S.Ct. at 2346, 33 L. Ed.2d at 279. Later, the Court expressed the point more directly: "It is to be remembered that the effect of the College's denial of recognition was a form of prior restraint, denying to petitioners' organization the range of associational activities described above." 408 U.S. at 184, 92 S.Ct. at 2348, 33 L. Ed.2d at 281.

 Since the first amendment prohibits the state from interfering with the expression of unpopular, indeed offensive, views, and with assembly and association for the purpose of exchanging and furthering them, we think that the first amendment protects the expression of such views in those public places dedicated to the exercise of first amendment rights by groups which implement them by restrictive membership policies.[10] We therefore, conclude that the School Board's denial of the use of a public forum because of the Party's discriminatory membership policies constitutes as· much of an invalid prior restraint as if it had denied the Party the use of the forum on the basis of the controversial beliefs which the Party would express at that place.

 The Party's discriminatory membership policy does not bring into play the state action doctrine of the equal protection clause of the fourteenth amendment. The state action doctrine has never been thought to extend to cases where the streets, parks and public meeting places of a particular community are utilized for the exercise of first amendment rights.[11] No case suggests that a group which discriminates in selecting its membership can be barred from occasional uses of the streets, parks and public meeting places of a community. No case suggests that in maintaining a street, park or public meeting place, a state espouses the views which may be there expressed. No more

10. "The convictions or *affiliations* of one who requests the use of a school building as a forum is of no more concern to the school administrators than to a superintendent of parks or streets if the forum is the green or the market place." *Danskin*, supra at 892 of 171 P.2d (emphasis added).

11. See, e. g., *Collin*, supra; Rockwell v. Morris, 10 N.Y.2d 721, 219 N.Y.S.2d 605, 176 N.E.2d 836 (1961). Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15

L.Ed.2d 373 (1966), is not contrary. The applicability of the equal protection clause to the utilization of a municipal park by a group which has a discriminatory membership policy for the exercise of speech and assembly was not in issue. The case merely held that the exclusion of Negroes from a municipal park, formerly managed by public trustees but now managed by recently appointed private trustees, violated the equal protection clause.

is the state to be considered as espousing, encouraging, or supporting discriminatory membership policies when it permits an assembly of citizens, organized into a group which practices discriminatory membership policies, to meet in a public place which has been dedicated by practice as a public forum for the exercise of the rights to speech and assembly.

▐ The essential point here is not that there is insufficient state action, but simply that the state action doctrine is not applicable where a group seeks to exercise first amendment rights in a public forum dedicated to that purpose. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) does not require a different conclusion. *Burton* concerned a restaurant privately owned but operated in public facilities. It was an ordinary commercial activity. In contrast, we have here a political group which seeks to utilize a public forum. We have a place where the position of the state is required to be neutral and where denial of the use of the place will substantially impair the exercise of first amendment rights.

This case is not unlike Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), where the Court held that state payment of the transportation costs of children attending parochial schools did not violate the first amendment prohibition against laws "respecting the establishment of religion." Just as New Jersey in *Everson* did not transgress the establishment clause or unconstitutionally support parochial schools by providing transportation facilities and "such general government services as ordinary police and fire protection, connections for sewage disposal, public highways and sidewalks," *id.* at 17–18, 67 S.Ct. at 512, so, too, Virginia would not transgress the equal protection clause or unconstitutionally

support the Party by providing a public forum.[12] Although the establishment clause prohibited New Jersey from setting up a church, or enacting laws favoring one religion over another, or forcing a person to profess a belief or disbelief in any religion, New Jersey was prohibited from hampering its citizens in the exercise of their own religion by denying generally provided government services to certain groups. Similarly, although the fourteenth amendment in the instant case prohibits Virginia from practicing the discrimination which the Party practices, the first amendment also prohibits Virginia from hampering its citizens in the exercise of their right to speak and assemble freely by denying a generally provided public forum. In *Everson*, the state's payments were upheld because "[t]hat Amendment [the first amendment] requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions, than it is to favor them." 330 U.S. at 18, 67 S.Ct. at 513.

▐ The fact that the Party professes to be a political organization having as its purpose "the gaining of political power in the United States by all legal means and the elective process" does not alter our views. First, political organizations are entitled to first amendment protections, including the use of facilities for meetings and other appropriate purposes. Healy v. James, supra. Secondly, the use of facilities partially dedicated as a public forum for the expression of diverse views does not amount to state espousal of racist views, whether they are merely expressed or whether they are expressed by a group which implements them by racist membership policies. Finally, this is not a case where the Party has been shown to have obtained any degree of political success so that it may be fairly said, as

12. "A park . . . is more like a fire department or a police department that traditionally serves the community."

Evans v. Newton, supra at 302, of 382 U.S., at 490 of 86 S.Ct.

in the white primary cases,[13] that the Party, acting alone or in conjunction with state law, has abridged the right to vote and to participate in government by its discriminatory membership policies. If the latter situation arises, that will be time enough to deal with it.

The able dissent narrowly draws its opinion to apply only to the use of a public school auditorium by a political organization which has a racially discriminatory membership policy.[14] It would decide nothing with respect to the use of public forums by non-political organizations which have racially discriminatory membership policies or religiously or sexually discriminatory membership policies, or political organizations which espouse racist doctrines, but do not racially discriminate in selecting their members.[15] But we do not perceive what additional incremental impetus the Party receives from the state (even assuming *arguendo* that the state action doctrine applies) when it espouses its views from a public forum and its membership is closed, over and above the impetus it might receive if it articulated the same views from the same public forum and its membership was open. Perhaps a difference may exist where as a result of the discriminatory membership policy, the public building is open for use only on a discriminatory basis.

But here, although the Party does not admit Negroes to membership, the proposed March 7 meeting was open to the public at large.[16]

Nor do we perceive how the use of a public forum by a political organization which has a discriminatory membership policy differs from the use of the same forum by a non-political private club or organization, particularly where that political organization has no effective power. It would be ironic to hold that such a private discriminatory club could use public property for occasional meetings or conventions where no substantial first amendment interests are at stake, but that a fringe political organization could not, even though the very core values protected by the first amendment are at stake.[17]

We are confident that if the high school auditorium is made available to all groups, the very diversity and complexity of the views expressed, taken in bulk, will cure any incidental official identification attendant upon the use of the building for the articulation of extreme or abusive speech. At least that is the principle on which we have staked our all.[18] As Mr. Justice Brandeis said years ago, "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be ap-

---

13. Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932).

14. It is difficult to see why minority organizations, open only to minority group membership and dedicated to political action on behalf of the minority, would not be barred by such a rule.

15. See n. 1, supra. The proof adduced at trial amply supports the stipulation. Additionally, the proof shows that groups, the membership of which is limited by sex, had use of the facility.

16. The Party distributed leaflets which purported to invite only whites. But it is stipulated that "no member of the Negro race and/or Jewish religion has been, or would be, purposely excluded from at-

tendance or participation in a public meeting called by the Party. Public meetings of the Party have been attended by members of the Negro race and/or the Jewish religion."

17. See Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring); New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). "Freedom of expression in the political realm is usually a necessary condition for securing freedom elsewhere." T. Emerson, Toward A General Theory Of The First Amendment 9–10 (1963).

18. "The widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945).

plied is more speech, not enforced silence." Whitney v. California, 274 U.S. 357, 377, 47 S.Ct. 641, 649, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). We conclude therefore that, considering all the factors in this case, the School Board has not overcome the "heavy presumption" against its effective prior restraint on the Party's right to free speech.[19]

To summarize, we conclude that the state action doctrine has no application when the use of facilities effectively dedicated for the exercise of first amendment rights is involved. We therefore reverse the order of dismissal and remand the case for entry of an injunction requiring the Board to give the Party access to the auditorium unless a clear and present danger to good order or the preservation of property is shown.

Reversed and remanded.

BUTZNER, Circuit Judge (concurring in part and dissenting in part).

I concur in the court's ruling that expression of racist and anti-Semitic views does not bar the speaker from using public facilities. This much has long been settled and needs no elaboration. Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); Collin v. Chicago Park District, 460 F.2d 746 (7th Cir. 1972).

I dissent from that portion of the court's opinion that compels the State of Virginia to furnish a high school auditorium for public and private meetings of a political party that bars black people from membership. On this issue, the facts are not in dispute. The National Socialist White People's Party, a successor to the American Nazi Party, was incorporated in Virginia under the name of the "George Lincoln Rockwell Party." One of the purposes stated in its charter is "the gaining of political power in the United States by all legal means and the elective process." Membership is open only to white persons who embrace the Party's fundamental doctrines.

The Arlington County School Board initially granted the Party's application to use a high school auditorium for a public meeting. The Party then issued a news release announcing a rally in the auditorium, stating "all interested members of the general public [excluding Jews and Negroes] have been invited . . . ." When a school official learned of this release, anticipating violence, he immediately revoked the permit to use the auditorium and refunded the Party's rental fee. The Party nevertheless refused to cancel the rally and distributed flyers proclaiming that: "If you're a non-Jewish White person, you are invited . . ." On the evening of the rally the school was closed and guarded by police. Members of the Party noisily demonstrated at the school and at the home of the official who had revoked the permit. Subsequently, the Board denied the Party's applications for the use of facilities in which to hold other public and private meetings.

The Party claims that the Board's denial of a meeting place infringes the rights secured to it by the first and fourteenth amendments. I reject these claims because in my view the state possesses adequate power to deny the use of public buildings to organizations that exclude black people from membership.

I

FOURTEENTH AMENDMENT

The Party's claim that it has been denied equal protection of the laws because the Board has rented school facilities to other discriminatory organizations requires but brief comment. The record discloses that the Board has rented its facilities to churches which presumably

9. New York Times v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1563, 29 L.Ed.2d 1 (1971); Bantam Books v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Near v. Minnesota ex rel. Olson, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

exclude from membership those persons who do not subscribe to their religious doctrines. This fact, however, is of no moment. There is no evidence that any church group discriminated on racial grounds. Moreover, our national policy as expressed in the establishment and free exercise clauses of the first amendment is to encourage, not discourage, a plurality of religions. *E. g.,* Walz v. Tax Comm'n, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (tax exemptions for churches allowed). Quite the contrary is true of racial discrimination. *E. g.,* Green v. Connally, 330 F. Supp. 1150 (D.D.C.), aff'd sub nom. Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971) (tax exemptions for private segregated schools denied). The adoption of three constitutional amendments and the enactment of laws over the course of a century to secure civil rights affirm our national goal of eradicating all government-fostered racial discrimination.

Although the record discloses that the Board has rented its facilities to organizations that practice racial discrimination, there is no proof that the Board knew of the discrimination when it entered into the rental agreements. Indeed, when the Board found that the Party had invited "the general public [excluding Jews and Negroes]" to the rally it commendably revoked the Party's permit to use the auditorium.[1] There is no suggestion in the record that the Board would have acted differently with respect to other lessees. But even if the Party had been able to show that the Board had knowingly rented its facilities to racially discriminatory organizations, this fact would not compel the Board's rental of school property to the Party. A contrary conclusion would preclude any state agency from ending a past policy of discrimination. As Mr.

Chief Justice Vinson said in another context: "Equal protection of the laws is not achieved through indiscriminate imposition of inequalities." Shelley v. Kraemer, 334 U.S. 1, 22, 68 S.Ct. 836, 846, 92 L.Ed. 1161 (1948).

The Party's fourteenth amendment argument is also foreclosed by Railway Mail Ass'n v. Corsi, 326 U.S. 88, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945), which upheld the constitutionality of a New York law forbidding racial discrimination in labor unions against a fourteenth amendment challenge. Speaking for the Court, Mr. Justice Reed said: "A judicial determination that such legislation violated the Fourteenth Amendment would be a distortion of the policy manifested in that amendment which was adopted to prevent state legislation designed to perpetuate discrimination on the basis of race or color." 326 U.S. at 93, 65 S.Ct. at 1487. Concurring, Mr. Justice Frankfurter added: "To use the Fourteenth Amendment as a sword against such State power would stultify that Amendment." 326 U.S. at 98, 65 S.Ct. at 1489.

I conclude, therefore, that the fourteenth amendment does not authorize a federal court to compel a state to rent its property to an organization that bars black people from membership.

## II

### FIRST AMENDMENT

Were this case concerned solely with prior restraint on freedom of speech and assembly, I would not dissent. But this appeal does not turn on the right to preach racial hatred and religious bigotry. The first amendment clearly grants this right whether the speech is made in a park, on a street, or in a building that has been designated as a public forum. It is the Party's exclusion of black citi-

---

1. The Board's action should be judged on the facts then before it, not on the Party's subsequent stipulation to the effect that it didn't mean what it said. Despite its subsequent self-serving declaration that Jews and Negroes could have attended the meeting, the Party remains insistent that Negroes are barred from membership. Consequently, they can not attend the private meetings in the school that the opinion of the court authorizes.

zens, not its message, that justified the Board's refusal to rent the auditorium.

Contrary to the Party's assertion, its first amendment rights are not so overriding that its racially discriminatory membership policy is irrelevant. Freedom of speech, assembly, and association are guaranteed by the first amendment to political organizations. Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). Indeed, these rights are indispensable to a democracy. Nevertheless, the guarantee of first amendment freedoms does not compel a state to nurture racially discriminatory political parties. Just the opposite is true.

In a long line of cases, the Supreme Court has construed the fourteenth and fifteenth amendments to prohibit a wide variety of devices designed to keep black citizens from participating in political parties and the election process.[2] As the abolition of white primaries attests, the state, acting through political parties or political associations, cannot abridge the right of a citizen to vote on account of race or deny him the equal protection of the laws.[3] While some of these cases involve the fourteenth amendment and others the fifteenth, the distinction is not critical to this appeal because both amendments bar discrimination that is tainted by state action. These cases demonstrate that careful scrutiny of the state's involvement is demanded when the state aids political associations that discriminate on racial grounds. They teach, albeit implicitly, that when state action is united with a political party or association that bars black people from full participation in its affairs, the union is illegal despite the first amendment rights possessed by white members of the organization. These cases provide no valid distinction between a political party which has enjoyed success and one that has not. To permit the Party to use the school auditorium now, but to refuse it access in the future when it achieves success is simply locking the barn door after the horse has been stolen.

2. South Carolina v. Katzenbach, 383 U.S. 301, 311–312, 86 S.Ct. 803, 810, 15 L.Ed.2d 769 (1966), catalogs devices "designed to deprive Negroes of the right to vote" in violation of the fifteenth amendment:

"Grandfather clauses were invalidated in Guinn v. United States, 238 U.S. 347 [35 S.Ct. 926, 59 L.Ed. 1340], and Myers v. Anderson, 238 U.S. 368 [35 S.Ct. 932, 59 L.Ed. 1349]. Procedural hurdles were struck down in Lane v. Wilson, 307 U.S. 268 [59 S.Ct. 872, 83 L.Ed. 1281]. The white primary was outlawed in Smith v. Allwright, 321 U.S. 649 [64 S.Ct. 757, 88 L.Ed. 987], and Terry v. Adams, 345 U.S. 461 [73 S.Ct. 809, 97 L.Ed. 1152]. Improper challenges were nullified in United States v. Thomas, 362 U.S. 58 [80 S.Ct. 612, 4 L.Ed.2d 535]. Racial gerrymandering was forbidden by Gomillion v. Lightfoot, 364 U.S. 339 [81 S.Ct. 25, 5 L.Ed.2d 110]. Finally, discriminatory application of voting tests was condemned in Schnell v. Davis, 336 U.S. 933 [69 S.Ct. 749, 93 L.Ed. 1093]; Alabama v. United States, 371 U.S. 37 [83 S.Ct. 145, 9 L.Ed.2d 112]; and Louisiana v. United States, 380 U.S. 145 [85 S.Ct. 817, 13 L.Ed.2d 709]."

To these cases may be added Hadnott v. Amos, 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969), which invoked the first, fourteenth, and fifteenth amendments to void discriminatory enforcement of a Corrupt Practices Act against Negro candidates.

The Court relied on the fourteenth amendment in holding that both a Texas state law prohibiting Negroes from voting in Democratic Party primaries, Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927), and rules of the State Executive Committee of the Democratic Party of Texas excluding Negroes from voting in the party's primaries, Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932), were unconstitutional.

3. Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed.2d 987 (1944); Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); Baskin v. Brown, 174 F.2d 391 (4th Cir. 1949); Rice v. Elmore, 165 F.2d 387 (4th Cir. 1947), cert. denied, 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed. 1151 (1948).

Political parties are not the only institutions that are required to exercise first amendment rights within a nondiscriminatory framework. For example, students and labor union members also possess freedom of speech and association.[4] But the first amendment does not insulate schools and unions from observing the rights of racial minorities.[5] Indeed, in Healy v. James, 408 U.S. 169, 183 n. 11, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), upon which the Party primarily relies, Mr. Justice Powell was careful to note that the political organization which claimed first amendment rights did not dispute the college's rule that it could not discriminate "on the basis of race, religion or nationality."

Similarly, Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), provides the Party scant support. There the Court held that the first amendment did not prohibit New Jersey from paying transportation costs of children attending parochial schools. Significantly, the Court did not hold—as the Party contends in the case before us —that a state is compelled to furnish such transportation. Moreover, while the question is not free from doubt, it is possible that the state would have been prohibited from making the contribution if the schools had excluded pupils on the basis of race. *Cf.* Cooper v. Aaron, 358 U.S. 1, 17, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); Poindexter v. Louisiana Financial Assistance Comm'n., 275 F.Supp. 834 (E.D.La.1967), aff'd, 389 U.S. 571, 88 S. Ct. 693, 19 L.Ed.2d 780 (1968); *but cf.* Norwood v. Harrison, 340 F.Supp. 1003 (N.D.Miss.1972), prob. juris. noted, 409 U.S. 839, 93 S.Ct. 68, 34 L.Ed.2d 79 (1972).

The Party also contends that its first amendment rights are paramount because rental of the school auditorium would not involve the state in promoting the Party's racist policies. The Party insists that, tested by Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), the rental of school property is innocuous. In *Moose Lodge,* the Court held that Pennsylvania's grant of a liquor license to a private club did not sufficiently involve the state to bring the club's racially discriminatory guest policies within the ambit of the fourteenth amendment. *Moose Lodge,* it is readily apparent, does not reach the claim on which the Party's application for an injunction is based— that the first amendment requires the state to confer benefits on an organization despite its practice of racial discrimination. Moreover, the facts in *Moose Lodge* readily distinguish it from the case before us. The lodge, as the Court noted, is a private club; in contrast, the Party is a political organization open to all white persons who subscribe to its doctrines. The lodge conducted all of its activities in its own building on its own land; the Party, on the contrary, seeks to hold its meetings in a public building. Finally, *Moose Lodge* rests on the conclusion that the grant of a state liquor license cannot be said in any way to foster or encourage racial discrimination; a similar conclusion, however, cannot be reached here. As the Party's charter indicates, it is dedicated to gaining national political power. The proof establishes beyond question that it desires to use county school property for various meetings, both public and private, to further its political aims.

Viewing these facts in their entirety, I conclude that the state aid which the Party seeks is legally significant and that its reliance on *Moose Lodge* is misplaced. Mr. Justice Rehnquist, the author of *Moose Lodge,* carefully distin-

4. Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

5. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954);

Railway Mail Ass'n v. Corsi, 326 U.S. 88, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945); United States v. International Longshoremen's Ass'n, 460 F.2d 497 (4th Cir.), cert. denied, 409 U.S. 1007, 93 S.Ct. 439, 34 L.Ed.2d 300 (U.S. Nov. 14, 1972) (No. 72–360).

guished Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), which is the leading case holding that rental of state property to a lessee that practices racial segregation constitutes illegal state action. In this case we deal with a political organization whose involvement with the state becomes an even more sensitive issue than that of the restaurant in *Burton*. If the Party's rental applications are granted, the Party will enjoy the convenience of a modern public auditorium. Use of this facility could give the Party respectability derived from its official recognition as a responsible political organization. There can be no doubt that rental of school property would foster the racial practices that are fundamental to the Party's existence. The fact that the Party, not the state, originated the discrimination is inconsequential. State involvement is prohibited when the state "in any way act[s] to . . . encourage racial segregation."[6]

Furthermore, at the risk of being repetitious, I emphasize that the School Board has chosen not to ally itself with the Party's racial practices. Therefore, even if it were to be conceded that the fourteenth and fifteenth amendments permit the state to rent its property to a racially discriminatory political organization, the issue is not settled. The state's power to prohibit racial discrimination is broader than the fourteenth amendment's ban on discriminatory state action. *See* Railway Mail Ass'n v. Corsi, 326 U.S. 88, 98, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945) (Frankfurter, J., concurring). There is no reason why this principle which pertains to labor unions whose members also possess first amendment rights should not be applied to political parties.

Less my dissent provoke misunderstanding, I repeat that it is based on the

racially discriminatory practices of the Party, not its speeches. A political party's rhetoric cannot be equated with its rules. Though politicians of every persuasion are entitled to freedom of speech and assembly, their exclusion of people from party membership on account of race is a tactic that has been expressly condemned by the Supreme Court.[7] The Constitution's requirement of unrestricted membership is calculated to encourage, not suppress, free discussion and association. By declaring that political parties must be open to all citizens, the Court has wisely assigned priority to the political rights secured by the fourteenth and fifteenth amendments. Experience has shown this primacy affords ample accommodation for first amendment rights, and I see no reason in this appeal to encroach upon it. The Party's exclusion of black citizens from membership is the decisive step beyond advocacy that justified the district court's dismissal of its complaint.

---

6. Adickes v. S. H. Kress & Co., 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1969). *See also* Moose Lodge # 107 v. Irvis, 407 U.S. 163, 172, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); Reitman v. Mulkey, 387 U.S. 369, 381, 87 S.Ct. 1627,

18 L.Ed.2d 830 (1969); Robinson v. Florida, 378 U.S. 153, 156, 84 S.Ct. 1693, 12 L.Ed.2d 771 (1964); Anderson v. Martin, 375 U.S. 399, 404, 84 S.Ct. 454, 11 L.Ed.2d 430 (1963).

