**LOCAL ORGANIZING COMMITTEE, DENVER CHAPTER, MILLION MAN MARCH, a non-profit corporation, Randy Craven, Lanetta Haynes, Jamal Muhammad, and Alvertis Simmons, Plaintiffs,**

v.

**Craig A. COOK, in his official capacity, and the Board of Education of the Denver Public Schools, Defendants.**

Civil Action No. 96–D–768.

United States District Court, D. Colorado.

April 18, 1996.

Mark Silverstein, American Civil Liberties Union, Foundation of Colorado, Denver, CO & David K. Rees, Rees & Associates, P.C., Denver, CO, for Plaintiffs.

Michael H. Jackson, Franklin A. Nachman, Semple & Jackson, Denver, CO, for Defendants.

### MEMORANDUM OPINION AND ORDER

DANIEL, District Judge.

This matter is before the Court in connection with plaintiffs' Motion for Preliminary Injunction, filed April 3, 1996. Having conducted an evidentiary hearing on the request for injunctive relief on April 17, 1996, considered the allegations contained in the Complaint, and reviewed the arguments and legal authorities contained in the parties' briefs, I

conclude that plaintiffs' Motion for Preliminary Injunction must be GRANTED for the reasons discussed below.

## I. *RELEVANT FACTS & PROCEDURAL HISTORY*

After the defendants denied their request for a permit to hold a rally in the auditorium at George Washington High School (GW) in Denver, plaintiffs filed this action, pursuant to 42 U.S.C. §§ 1983, 1988, alleging violations of their First, Fifth, and Fourteenth Amendment rights under the United States Constitution. Specifically, on April 1, 1996, Randy Craven, one of the plaintiffs, filed a formal application for permission to use the auditorium at GW, after normal school hours, to hold an "Attitude and Consciousness Youth Forum" on either April 3 or April 22, 1996.[1] Plaintiffs Craven, Muhammad, and Simmons are among the anticipated speakers at the program, which plaintiffs now desire to hold on April 22. On the same day the application was submitted, Defendant Craig A. Cook, Chief Operating Officer of the Denver Public Schools (DPS), denied the permit request at the express direction of Irv Moskowitz, Denver Public Schools Superintendent. In his letter of denial, Cook stated that "[t]he proposed use is not in the best interest of the school district." However, it is clear from the testimony and evidence received at the hearing that Superintendent Moskowitz's decision was not made in a vacuum. His "best interests" determination was motivated by events that had occurred earlier. The next day, April 2, 1996, plaintiffs filed the instant lawsuit.

Plaintiffs submitted their permit request to the Board of Education of the Denver Public Schools (Board) pursuant to a policy established by the Board by which numerous private organizations and community groups are allowed to use the facilities at DPS schools to present educational and community-oriented programs.[2] Because of this existing Board policy, the parties agree and stipulate that schools within DPS—including GW—constitute "limited public forums" or "designated public forums," as discussed in further detail below. Since the GW auditorium is a limited public forum, plaintiffs contend that the defendants violated their First, Fifth, and Fourteenth Amendment rights by denying their permit request. More precisely, plaintiffs claim that they are entitled to injunctive relief for either of two reasons: (1) in general, the Board's policy of reviewing permit applications under a "best interests" standard is constitutionally infirm insofar as it grants the Board unfettered discretion and thus acts as a *de facto* unlawful prior restraint of expression; and (2) in this instance, the Board's denial of a permit constitutes unconstitutional content or viewpoint based discrimination.

Defendants' response is that on March 13, 1996, between 100 and 150 students, out of a total enrollment of 1700, left GW without permission during school hours and staged a walkout for two days. Apparently the students, most if not all of whom were African American, were dissatisfied with a number of policies and practices at GW and felt that the school administration was unresponsive to their concerns/demands. Defendants claim

---

1. More precisely, the Application was filed in the name of the "Local Organizing Committee for the Million Man March [t]hrough its authorized Agent Randy Craven, Deputy Director." In response to the pre-printed question—"State nature of use, title of performance, names of speakers, as appropriate"—Craven wrote: "Attitude & Consciousness Youth Forum. Randy Craven, students, Dr. Beverly Lumumba, Alvertis Simmons & Jamal Muhammad."

2. Specifically, the DPS' policy, entitled "Community Use of School Facilities," provides:

   Denver Public Schools shall make its buildings and facilities available to the community for the use of responsible organizations or groups of citizens when school is not in session.

   Such permission and use shall not constitute an endorsement by the school district of any organization or group nor of the program, philosophies, goals or beliefs of any such organizations or groups or the expression of opinion regarding the nomination, retention, election or defeat of any candidate nor the expression of any opinion as to the passage or defeat of any issue.

   Users shall adhere to all school district regulations pertaining to the use of school facilities. The Board of Education reserves the right to refuse approval or to cancel any permits issued for the use of a school building or its facilities when it is deemed that such action is necessary for the best interests of the school district.

that this walkout was aided and abetted by one of the plaintiffs, Alvertis Simmons. Specifically, in this regard, though the evidence is unclear whether Simmons encouraged the students—one of whom was his daughter, Joy Walker—to walkout, Simmons arrived at the school shortly after the walkout commenced. Simmons also spent much of the day with the absentee students, though he testified that as far as encouraging or discouraging the students to return to school, he was noncommittal since the students had made a decision on principle.

The evidence also shows that Plaintiffs Craven and Muhammad were not present at GW on March 13, 1996. Likewise, no evidence was presented to tie either Craven or Muhammad to endorsing such a walkout nor did either apparently spend any part of March 13, 1996 with students who had participated in the walkout. To this effect, Craven testified that although he was present at two meetings—December 15, 1995 & January 5, 1996—where students discussed the possibility of a walkout, he actually discouraged the idea at the first meeting and stated no opinion at the second meeting. Thus, of the adult plaintiffs who were listed in Craven's application to speak on April 22, 1996, only one—Alvertis Simmons—even arguably played any part in the decision to stage a walkout.

Turning to March 14, 1996, the second day of the walkout, Plaintiffs Simmons and Muhammad, along with dozens of students and adults, met with GW's principal, Vivian Johnston, as well as GW teachers and DPS administrators to discuss concerns. During this meeting, it is alleged that threats, insults, and slanderous remarks were directed at school officials by Simmons. At the hearing, it was established that Simmons, in an agitated manner, pointed in Principal Johnston's direction and in a raised voice stated, "We will stay out until our demands are met," or words to that effect. Simmons testified that he was merely echoing the sentiments of the students who asked him to plead their case. Besides his presence, there was no evidence as to what role, if any, Plaintiff Muhammad played at the meeting. Similarly, Craven was not present at this

meeting, though he did meet with Superintendent Moskowitz the next day, March 15, where he conveyed his opinion that Principal Johnston should be fired.

Citing published reports, defendants also claim that since the March 14, 1996 meeting, plaintiffs have uttered remarks to the effect that GW is "perceptibly the most racist high school in the DPS district." Defendants further contend that some of these statements are connected to the April 22, 1996 planned rally. Therefore, defendants argue that their denial of the permit is legally justified in light of plaintiffs' actions which have arguably interfered with and undermined the educational program at GW. Defendants deny that Superintendent Moskowitz's decision was related to the content or viewpoint of the anticipated remarks to be uttered at the rally. To this effect, defendants note that they authorized a similar rally at Denver's East High School on February 29, 1996 because the plaintiffs and their representatives had no prior negative involvement with East High School administrators. Also, an assembly that occurred at Montbello High School during school hours was likewise differentiated from the April 22, 1996 GW event.

Thus, as they succinctly frame it in their brief, the bottom line of defendants' position is that "[t]he School District denied plaintiffs' request to use George Washington in the interest of preventing further disruption of the academic programs at the school." Notwithstanding the sincerity of their beliefs or Superintendent Moskowitz's desire to ensure that no further school disruptions occur, I hold that defendants' denial of the application submitted by Craven on behalf of the Local Organizing Committee of the Million Man March was a violation of plaintiffs' First Amendment rights.

## II. DISCUSSION AND LEGAL ANALYSIS

The Tenth Circuit Court of Appeals has held that a district court must apply a four-prong test when evaluating whether a preliminary injunction should issue. Specifically, the moving party must establish: (1) a substantial likelihood that it will eventually prevail on the merits; (2) that it will suffer

irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980); Fed.R.Civ.P. 65(a); *cf.* 11A Charles A. Wright et al., *Federal Practice and Procedure* § 2948, at 133 (1995).

### A. Likelihood of Prevailing on the Merits

■ In considering plaintiffs' first argument—i.e., that the Board's facility use policy constitutes an unlawful prior restraint—"[i]t should be generally noted that any governmental order that restricts or prohibits speech prior to its publication constitutes a prior restraint." 4 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 20.16, at 80 (2d ed. 1992). That is, though we traditionally think of prior restraints in other contexts (i.e. newspaper publishing), a licensing or permitting requirement can just as easily constitute an unlawful prior restraint. Such was the case in *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), wherein the Supreme Court held that a city's "rejection of [a] petitioner's application to use [a] public forum accomplished a prior restraint under a system lacking in constitutionally required minimal procedural safeguards." *Id.* at 552, 95 S.Ct. at 1243.

Much like the case here, in *Conrad*, the City of Chattanooga denied a travelling theater company's application to use the city's municipal theater to perform the musical "Hair" because it was deemed not "in the best interest of the community." *Id.* at 548, 95 S.Ct. at 1241. In *Conrad*, one seeking to use a theater was required to apply to a city board. The board was empowered to determine whether the applicant should be granted permission—in effect, a license or permit—on the basis of its review of the content of the proposed production. *Id.* at 554, 95 S.Ct. at 1244. In rejecting such a system, the Supreme Court compared the facts in *Conrad* to previous cases and stated that

[i]n these cases, the plaintiffs asked the courts to provide relief where public officials had forbidden the plaintiffs the use of public places to say what they wanted to say. The restraints took a variety of forms, with officials exercising control over different kinds of public places under the authority of particular statutes. All, however, had this in common: they gave public officials the power to deny the use of a forum in advance of actual expression.

Invariably, the Court has felt obliged to condemn systems in which the exercise of such authority was not bounded by precise and clear standards. The reasoning has been, simply, that the danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use. Our distaste for censorship—reflecting the natural distaste of a free people—is deep-written in our law. In each of the cited cases the prior restraint was embedded in the licensing system itself, operating without acceptable standards.

*Id.* at 553, 95 S.Ct. at 1243.

The reasoning employed in *Conrad* is equally applicable here. Since the Board's permitting requirement acts as a *de facto* prior restraint, it places unfettered discretion in the hands of administrative officials to determine what is in "the best interests of the community." To be clear, I note that a permitting requirement is not *per se* unconstitutional. In fact, insofar as a permit ensures that content-neutral time, place, and manner restrictions are complied with, its use is perfectly proper. *Poulos v. New Hampshire*, 345 U.S. 395, 408, 73 S.Ct. 760, 768, 97 L.Ed. 1105 (1953); *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941).

However, given the evidence presented to me, I find that the permitting requirement served as a content-based colander whereby the Board, through Superintendent Moskowitz, rejected the plaintiffs' application based on what they deemed improper anticipated comments and potential student response. Such a system does not pass constitutional muster since the settled rule is that a system

of prior restraint "avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Freedman v. Maryland*, 380 U.S. 51, 58, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965). Here, the record indicates that no procedural safeguards exist. Accordingly, the permitting system employed by defendants is an unlawful prior restraint. *See Conrad*, 420 U.S. at 559, 95 S.Ct. at 1247 ("we conclude that the standard . . . was not implemented by the board under a system with appropriate and necessary procedural safeguards"); *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150–51, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162 (1969) (holding that a city ordinance regarding parade permitting requirements was unconstitutional unless it contained "narrow, objective, and definite standards to guide the licensing authority"); *Kunz v. New York*, 340 U.S. 290, 295, 71 S.Ct. 312, 315, 95 L.Ed. 280 (1951) (stating that "New York cannot vest restraining control over the right to speak on religious subjects in an administrative official when there are no appropriate standards to guide his action"); *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (permitting requirement was held void on its face); Rodney A. Smolla, *Smolla and Nimmer on Freedom of Speech: A Treatise on the First Amendment* § 8.01[4] (1994) ("The [Supreme] Court has tended to recognize only a narrow number of situations in which prior restraints might be permissible, such as restraints against obscenity, or to protect imminent threats to national security, or as a last resort to protect a defendant's right to a fair trial, and has suggested that outside these narrow 'exceptions,' no prior restraints at all should be permitted.").

■ Turning to plaintiffs' second argument—that the Board impermissibly denied their permit request based on the anticipated content of their speech—both parties agree, as noted earlier, that GW falls within the "designated public forum" or "limited public forum" category. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983) (discussing classification of fora). Being a designated public forum, the Board's denial of plaintiffs' permit application is sub-

ject to strict constitutional scrutiny. *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 808, 105 S.Ct. 3439, 3452, 87 L.Ed.2d 567 (1985). As the *Perry* court explained:

> A second category consists of public property which the State has opened for use by the public as a place for expressive activity. The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest.

*Perry*, 460 U.S. at 45–46, 103 S.Ct. at 955 (internal citations omitted).

Here, because the denial of the permit was not a content-neutral regulation of time, place, or manner-of-speech, it is justified only if it is narrowly tailored to achieve a compelling government interest. *Id.* Defendants contend that the compelling government interest at stake here is the orderly continuation of the educational process at GW. To this effect, they note, and the evidence supports, that at least one of the plaintiffs was present when the student walkout commenced on March 13. Defendants also point to the fact that they have allowed similar presentations at other schools as evidence that they are not censoring *content* but rather trying to regulate *conduct*. Or, put another way, defendants contend that they are only interested in the *content* of plaintiffs' rally insofar as it may affect the *conduct* of their students.

However, even accepting Superintendent Moskowitz's assertion at face value that his sole motivation in denying the permit was to avoid further disruption of school processes, the record provides no basis to believe that further disruptions will occur. That is, if the compelling governmental interest is the avoidance of further walkouts, there is no

basis to conclude that the rally planned for April 22, 1996 from 5:00 to 7:00 p.m. will foster such a response. As highlighted above, Plaintiff Craven, who actually filed the application, was not present at GW on March 13 and testified that he actually discouraged any walkout. Similarly, notwithstanding his rhetoric on other occasions, Plaintiff Muhammad was not present at GW on March 13 nor is there any evidence that he supported the walkout. Thus, the perceived link between the March walkout and the scheduled rally on April 22, 1996 is not supported by credible evidence. More importantly, based on the evidence presented at the hearing, there is no basis to believe that the rally will cause further school disruptions in the form of a walkout.

Furthermore, notwithstanding how the issue is delicately framed by defendants, I conclude that the permit was denied based on the anticipated remarks to be uttered. As the Supreme Court just recently explained:

> It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.... Discrimination against speech because of its message is presumed to be unconstitutional.... When the government targets not the subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.... The government must abstain from regulating speech when specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.

*Rosenberger v. Rector & Visitors of Univ. of Va.,* — U.S. —, —, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 (1995) (internal citations omitted).

Similarly, in *National Socialist White People's Party v. Ringers,* 473 F.2d 1010 (4th Cir.1972) (*en banc*), a political party sued to compel a local school board to grant a permit to use a high school auditorium for a meeting to be held during nonschool hours where it was predictable that the plaintiff would utter racist and anti-semitic views. In reversing the district court's dismissal of the complaint and remanding the case for entry of an injunction requiring the Board to provide access to the auditorium unless a clear and present danger existed, the Court stated:

> There is no dispute that the first amendment protects from state interference the expression in a public place of the unpopular as well as the popular and the right to assemble peaceably in a public place in the interest and furtherance of the unpopular as well as the popular. Specifically, the expression of racist and anti-semitic views in a public place and the right to assemble in a public place for the purpose of communicating and discussing racist and anti-semitic views are protected activities and may not be circumscribed by the state, except where "advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."

*Id.* at 1015 (citation omitted).

Perhaps more on point, in *Grace Bible Fellowship, Inc., v. Maine School Administrative District # 5,* 941 F.2d 45 (1st Cir. 1991), the court admonished a school district when faced with somewhat similar circumstances:

> But SAD 5 provides the forum, not simply for educationally-related purposes, but as a service to the community. That being so, SAD 5, being a government arm, has no greater right to pick and choose among users on account of their views than does the government in general when it provides a park, or a hall, or an auditorium, for public use. The bare fact is, SAD 5 has volunteered expressive opportunity to the community at large, excluding some because of the content of their speech. This is elementary violation. Private citizens can freely choose the recipients of their benefactions; the state has restrictions. One of these is the First Amendment.

*Id.* at 48. Similarly, "[n]or is the exclusion justified by the supposedly 'controversial' nature of [plaintiffs'] message. Potential controversy is not a permissible basis on which to deny access to a designated or limited public forum where less controversial speakers on the same subject are admitted." *Travis v. Owego–Apalachin Sch. Dist.,* 927 F.2d 688, 694 (2d Cir.1991); *cf.* Vince Blasi, *Prior*

*Restraints on Demonstrations,* 68 Mich. L.Rev. 1481, 1519 (1970) ("A permit never should be denied because of the past conduct of the applicant.").

Finally, before returning to the facts of this case, I note that any attempt by defendants to classify this as a "fighting words" case is unfounded. As one commentator has stated:

> The state may forbid speech because it is calculated to cause violence in a situation where there is a studied effort to "incite" a particular individual to fight, and therefore there is no time to avert the problem by discussion of the falsehood and fallacies. Words are "fighting words" when they are an offer to exchange fisticuffs.

4 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 20.40, at 247 (2d ed. 1992); *see also Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *Hess v. Indiana,* 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973). In contrast, here there is no basis to believe that plaintiffs' presentation will spur any immediate unlawful action. In fact, the evidence presented at trial indicates that the March walkout was, in the words of Defendant Cook, "orderly, controlled, and dignified." Similarly, Superintendent Moskowitz testified that the potential violation of any criminal laws was not a motivating factor in his decision to deny the application. Thus, there is no basis to conclude that the permit was denied on the ground that the proposed rally will likely produce "imminent lawless action." *Brandenburg,* 395 U.S. at 447, 89 S.Ct. at 1829.

Applying these legal principles to the facts of this case, I find that DPS and the Board have a long standing policy of allowing private organizations and community groups to use high schools, during nonschool hours, for a variety of programs and events where points of view on a wide range of topics are discussed. In fact, Superintendent Moskowitz testified that he has never denied an application in all his years of service until this instance. Further, I find that through the exercise of this policy, DPS and the Board have transformed auditoriums and gymnasiums at many of the DPS schools into public fora where members of the Denver community regularly exercise their First Amendment rights. The existence of this policy was pointedly evidenced by the defendants' decision to grant a permit to some of these same plaintiffs to hold an after school rally at East High School on February 29, 1996. Jamal Muhammad was the featured speaker at that rally, which was a peaceful assembly, and his views were widely reported in the media following the event.

To the extent that the defendants now seek to prohibit some of these same plaintiffs from conducting a rally in GW's auditorium on April 22, 1996 under the premise that some of the plaintiffs have engaged in conduct detrimental to the educational mission at GW, I find that such rationale fails to satisfy constitutional muster for either of two reasons: (1) in general, the Board's policy of reviewing permit applications under a "best interests" standard is constitutionally infirm insofar as it grants the Board unfettered discretion and thus acts as a *de facto* unlawful prior restraint of expression; and (2) in this instance, the Board's denial of a permit constitutes unconstitutional content or viewpoint based discrimination. Thus, I conclude that plaintiffs' First Amendment rights were violated when defendants denied their permit request; accordingly, plaintiffs have satisfied their burden of showing a substantial likelihood of eventually prevailing on the merits.

### B. *Other Factors Necessary to Warrant Injunctive Relief*

In short, plaintiffs also satisfy the other three preliminary injunctive relief requirements. *Lundgrin,* 619 F.2d at 63. First, the irreparable harm that plaintiffs would suffer if the Court denies injunctive relief is self-evident. As the Supreme Court has aptly stated, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976). Similarly, since plaintiffs' fundamental First Amendment rights are at stake, it is clear that their threatened injury outweighs whatever specu-

lative damage the proposed injunction may cause defendants. Finally, as far as the public interest is concerned, it is axiomatic that the preservation of First Amendment rights serves everyone's best interest. *Cf. Knights of the Ku Klux Klan v. East Baton Rouge Parish Sch. Bd.,* 578 F.2d 1122, 1128 (5th Cir.1978) ("We conclude that enjoining a selective denial of a dedicated public forum to a group because of its ideas or membership policies would forward and not contravene the public interest.").

## III. CONCLUSION

For the reasons discussed above, plaintiffs' Motion for Preliminary Injunction is hereby

GRANTED. Accordingly, it is

ORDERED that defendants SHALL, consistent with their normal procedures, APPROVE plaintiffs' application to hold an "Attitude & Consciousness Youth Forum" at George Washington High School on April 22, 1996 from 5:00 p.m. to 7:00 p.m.