UNITED AUTO WORKERS, Local # 5285, Plaintiff–Appellant,

v.

GASTON FESTIVALS, INCORPORATED, Defendant–Appellee.

No. 94–1387.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 2, 1994.

Decided Jan. 10, 1995.

---

**ARGUED:** Marcia Weil Borowski, Stanford, Fagan & Giolito, Atlanta, GA, for appellant. Charles Preyer Roberts, III, Haynsworth, Baldwin, Johnson & Greaves, P.A., Greensboro, NC, for appellee. **ON BRIEF:** Glenn L. Spencer, Haynsworth, Baldwin, Johnson & Greaves, P.A., Greensboro, NC, Charlton K. Torrence, III, Stott, Hollowell, Palmer & Windham, Gastonia, NC, for appellee.

Before WILKINS, LUTTIG, and WILLIAMS, Circuit Judges.

Affirmed by published opinion. Judge LUTTIG wrote the opinion, in which Judge WILKINS and Judge WILLIAMS joined.

## OPINION

LUTTIG, Circuit Judge:

The United Auto Workers, Local 5285 (UAW), appeals the dismissal of its suit under 42 U.S.C. § 1983 alleging that its First Amendment rights were violated when it was denied an information booth at an annual festival organized by a private corporation in Gastonia, North Carolina. The district court dismissed the suit after holding that the festival's organizer, Gaston Festivals, Inc. (GFI), is not a state actor and thus is not subject to the requirements of section 1983.

We agree that GFI did not engage in state action and therefore affirm the judgment of the district court.

### I.

GFI is a private, non-profit corporation that organizes and promotes the Fish Camp Jam, an annual festival held in downtown Gastonia, North Carolina. The festival's name derives from Gaston County's unique restaurants, called "Fish Camps," which were built along the banks of the county's two rivers to serve the local fishermen's catch. Visitors to the festival are treated to musical acts, games, and contests, and can even go fishing at the festival's fishing hole. Children are entertained by storytellers, jugglers, and clowns. And the festival hosts an art contest and a vintage car display. J.A. at 18–20. There are also two designated food areas, Fish Camp Row and Gaston Flavors, where volunteers fry over four tons of fish and "countless hushpuppies" in eight hours. J.A. at 19. The most popular attraction is the traditional "catfish races," where "farm raised catfish are run in heats," with the winner determined in a final race. For a $25 donation to local charities, spectators can purchase their favorite catfish, receive a tee-shirt, and have their photograph taken with the fish. J.A. at 20.

The Fish Camp Jam, in short, is a "one day community celebration" to build civic pride, showcase local talent, food, and culture, and provide entertainment for the local community. J.A. at 18. Its purpose is to provide a day of good, clean fun for the citizens of Gaston County.

The Jam is held on public streets and sidewalks and on private property in Gastonia's downtown area. GFI, as any other entity that wishes to use the City's land, must obtain a permit in order to use the public property during the festival. In addition to approving the permit, the City provides police protection, traffic department assistance, and sanitation services during the nine-hour event. J.A. at 18. In most respects, however, the Fish Camp Jam is conducted independent of the City of Gastonia. The event is staffed by a crew of approxi-

mately 500 volunteers. Although the City historically makes a $10,000 annual donation to the festival, local businesses provide most of the financing for the event. Local businesses also provide the food and much of the space for the festival. Radio and television stations promote the event through public service announcements and by sponsoring bands. All of the festival's proceeds go either to local charities or businesses, or to GFI. J.A. at 18–20. And the City plays no active role in planning or managing the festival. GFI alone decides which individuals and organizations will participate in the Fish Camp Jam. J.A. at 159.

During the festival, GFI allows local civic organizations to distribute literature from information booths in an effort to educate festival guests about community service and civic projects. The purpose of having these booths, like the purpose of the festival in general, is to "promote civic pride and awareness ... not to provide an advocacy forum for all those who wish to put their message before the public." Appellee's Br. at 4. As the event's organizers explained, "[p]olitical, ideological, and controversial issues are basically inconsistent with the purpose of the Fish Camp Jam." *Id.*

To ensure that information booths are allotted only to organizations promoting "civic pride and awareness" and that there is at least a limited respite from political and other controversial activities, GFI adopted a booth approval policy which states that

> Fish Camp Jam is neither politically, issue nor religiously oriented. "Issue" is intended to mean a subject which is a topic of public debate or controversy, whether on a local, state or national level (e.g. abortion); and not a subject upon which there appears to be a general consensus of opinion (e.g. anti-litter campaign). The nature of the festival, i.e. a large crowd of people in a relatively small area for several hours, dictates that those "issues" which are likely to foster confrontation or argument not be given a forum either pro or con in this setting. Therefore, booth space will not be granted to organizations falling in these realms.

J.A. at 27. Booth access is also strictly limited to non-profit organizations. J.A. at 27. Pursuant to the booth approval policy, GFI has denied booth space to the Republican, Democratic, and Libertarian parties, and to Planned Parenthood. J.A. at 29. Groups that have been offered booth space include Mothers Against Drunk Driving, the Humane Society, and local bond-issue groups. J.A. at 116.

In September 1993, the UAW applied for booth space to distribute literature on its "Buy American" campaign. The pamphlets that were proposed for distribution advocated various political positions of interest to the union. One brochure encouraged the boycott of toys made in China because "thousands of children, nuns, priests and other innocent people are jailed or persecuted [there] for their religious and political beliefs." J.A. at 34. Another brochure, opposing the North America Free Trade Agreement, urged "President Clinton and Congress [to] scrap Bush's 'free trade' deal." J.A. at 36. A third brochure, depicting a sweaty and obviously malodorous Nike sneaker, entreated consumers to boycott Nike products because Nike had moved many of its jobs abroad. J.A. at 39. GFI found UAW's messages to be inconsistent with the recreational purposes of the Fish Camp Jam and denied its application for a booth. Both parties acknowledge, however, that even without a booth, UAW members were still free to attend the festival, to hand out pamphlets at festival entrances, and to discuss their views with patrons of the Fish Camp Jam.

UAW instituted this action pursuant to 42 U.S.C. § 1983, alleging that GFI violated UAW's First Amendment rights by denying the union a booth at the festival. UAW sought injunctive relief, declaratory judgment, damages, and attorneys' fees. In October 1993, the district court held that GFI was not a state actor and therefore could not be sued under section 1983. Accordingly, the court denied UAW's motions for injunctive relief. UAW did not appeal this order, nor did it serve any discovery requests or notice any depositions. After four months passed with UAW taking no action, the district court dismissed UAW's complaint *sua*

*sponte* under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. This appeal followed.

## II.

Section 1983 provides that "[e]very person, who under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects ... any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. Liability under section 1983 only extends to persons acting under color of law, a requirement equivalent to that of state action under the Fourteenth Amendment. *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2769–70, 73 L.Ed.2d 418 (1982) (citing *United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966)). Thus, "conduct allegedly causing the deprivation of a federal right" is only actionable under section 1983 when the conduct is "fairly attributable to the state." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). The state action requirement "reflects judicial recognition of the fact that 'most rights secured by the Constitution are protected only against infringement by governments.'" *Id.* at 936, 102 S.Ct. at 2753 (quoting *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 156, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978)). "This fundamental limitation on the scope of constitutional guarantees 'preserves an area of individual freedom by limiting the reach of federal law' and 'avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed.'" *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 619, 111 S.Ct. 2077, 2082, 114 L.Ed.2d 660 (1991) (quoting *Lugar,* 457 U.S. at 936–37, 102 S.Ct. at 2753–54). The issue presented in this case is whether GFI engaged in state action when it organized and managed the 1993 Fish Camp Jam and denied booth space to UAW.

## A.

The central inquiry in determining whether a private party's conduct will be regarded as action of the government is whether the party can be described "in all fairness" as a state actor. *Id.* at 620, 111 S.Ct. at 2082.[1] One of the paradigmatic means by which a private party becomes subject to section 1983 is through the government's conferral upon that party of what is, at core, sovereign power. UAW's primary contention is that Gastonia conferred upon GFI such sovereign power and therefore that under the "government function" strand of the state action doctrine GFI must be held accountable as a state actor.

The mere "fact '[t]hat a private entity performs a function which serves the public does not make its acts [governmental] action.'" *San Francisco Arts & Athletics v. United States Olympic Comm.,* 483 U.S. 522, 544, 107 S.Ct. 2971, 2985, 97 L.Ed.2d 427 (1987) (quoting *Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. at 2772); *see Arlosoroff v. NCAA,* 746 F.2d 1019, 1021 (4th Cir.1984) (that NCAA's regulatory function was of some public service does not support finding of state action, where function is not one traditionally and exclusively reserved to state). Rather, under the "government function" standard, "the function performed [must be] 'traditionally the *exclusive* prerogative of the State.'" *Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. at 2772 (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 353, 95 S.Ct. 449, 455, 42 L.Ed.2d 477 (1974) (emphasis added by *Rendell–Baker* Court)).[2]

---

1. Here, the claimed constitutional deprivation is the denial of booth space at the Fish Camp Jam. Because GFI's authority to hold the Fish Camp Jam in downtown Gastonia, and hence its authority to select which organizations may occupy booths, derives from the permit it receives from Gastonia, the threshold requirement of state action that the "constitutional deprivation result[ ] from the exercise of a right or privilege having its source in state authority," *Edmonson,* 500 U.S. at 620, 111 S.Ct. at 2082, is obviously satisfied.

2. The Court in *Edmonson* seemed to ignore the "exclusivity" requirement of the "traditionally exclusive government function" test, *Edmonson,* 500 U.S. at 621, 624–28, 111 S.Ct. at 2083, 2084–87, and was criticized by the dissent for

The functions considered to fall traditionally within the exclusive prerogative of the state comprise a very narrow category, subject to "carefully confined bounds." *Flagg Bros.*, 436 U.S. at 163, 98 S.Ct. at 1737. The Supreme Court has identified as functions "traditionally. exclusively reserved to the State," *Jackson*, 419 U.S. at 352, 95 S.Ct. at 454, only the administration of elections, *Nixon v. Condon*, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); *Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); the operation of a company town, *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); eminent domain, *Jackson,* 419 U.S. at 353, 95 S.Ct. at 454–55 (dicta); peremptory challenges in jury selection, *Edmonson*, 500 U.S. at 624–25, 111 S.Ct. at 2084–85; and, in at least limited circumstances, *see* discussion *infra* at Part II.B., the operation of a municipal park, *Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). *See generally Jackson*, 419 U.S. at 352, 95 S.Ct. at 454 (cataloging cases).

The narrowness of this category is illustrated further by the functions that the Court has held do *not* fall traditionally within the exclusive prerogative of the state. These include the provision of electricity and other utilities, *id.* at 352–53, 95 S.Ct. at 454–55; the operation of nursing homes, *Blum,* 457 U.S. at 1011–12, 102 S.Ct. at 2789–90; and the coordination and governance of college and amateur athletics, *Tarkanian,* 488 U.S. at 197–98 n. 18, 109 S.Ct. at 465 n. 18; *USOC,* 483 U.S. at 544–45, 107 S.Ct. at 2985. The Court has held that schooling for maladjusted children does not qualify as a traditional and exclusive state function. *Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. at 2772 ("[U]ntil

recently the State had not undertaken to provide education for students who could not be served by traditional public schools."). It has also noted that the provision of education does not render a private school's administrators state actors, even though "[i]t is difficult to imagine a regulated activity more essential or more 'clothed with the public interest' than the maintenance of schools." *Jackson*, 419 U.S. at 354 n. 9, 95 S.Ct. at 455 n. 9 (quoting *Newton*, 382 U.S. at 300, 86 S.Ct. at 489) (observing that private parochial educational systems may operate without being subject to state action doctrine). *See also Milburn v. Anne Arundel County Dep't of Social Servs.*, 871 F.2d 474, 479 (4th Cir.), *cert. denied,* 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 106 (1989) ("care of foster children" not considered traditionally and exclusively a governmental function).

■ Together, these cases confirm that only those undertakings that are uniquely sovereign in character qualify as traditional and exclusive state functions. As the Court has observed, "[w]hile many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'" *Flagg Bros.*, 436 U.S. at 158, 98 S.Ct. at 1734; *see also Jackson,* 419 U.S. at 353, 95 S.Ct. at 455 (referring to the "limited line of cases" finding a function to be exclusively and traditionally governmental).

. .B.

■ The organization, management, and promotion of events such as the Fish Camp Jam do not fall within the domain of func-

having "misstated the law," *see id.* at 639, 111 S.Ct. at 2093 (O'Connor, J., dissenting). The Court's omission of this requirement raises a question as to whether the standard still includes such a requirement. *See, e.g., McKeesport Hospital v. Accreditation Council*, 24 F.3d 519, 528 (3d Cir.1994) (Becker, J., concurring). However, we do not believe the Supreme Court would have attempted to change radically the government function standard set forth in *Jackson,* 419 U.S. at 353, 95 S.Ct. at 454–55, and thereafter applied consistently in *Flagg Bros.*, 436 U.S. at 157–58, 98 S.Ct. at 1734, *Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. at 2772, *Blum v. Yaretsky,* 457 U.S. 991, 1005, 1011–12, 102 S.Ct. 2777, 2786, 2789–90, 73 L.Ed.2d 534 (1982), *USOC,* 483 U.S. at

544–45, 107 S.Ct. at 2985, and *NCAA v. Tarkanian,* 488 U.S. 179, 197–98 n. 18, 109 S.Ct. 454, 465 n. 18, 102 L.Ed.2d 469 (1988), through the transparent puerilism of simple omission. If it had intended to change the law in this respect, we believe it would have said so explicitly. Moreover, the ultimate reasoning of the Court in *Edmonson* was that juror selection was traditionally an exclusive governmental function. *See, e.g., Edmonson,* 500 U.S. at 627 ("The selection of jurors represents a *unique* governmental function delegated to private litigants by the government and attributable to the government ...." (emphasis added)). Accordingly, we proceed on the understanding that the "exclusivity" requirement must be satisfied.

tions exercised traditionally and exclusively by the government. The government has not traditionally been the sole provider of community entertainment. Nor has it traditionally been the exclusive organizer of festivals, parades, or fairs. Fairs and festivals such as the Fish Camp Jam have traditionally been administered primarily by private organizations, like churches, civic groups, or local business consortiums. The Supreme Court has expressed doubts that, as a general matter, "the operation of a park for recreational purposes is an exclusively public function," particularly in light of "the experience of several American entrepreneurs who amassed great fortunes by operating parks for recreational purposes." *Flagg Bros.*, 436 U.S. at 159 n. 8, 98 S.Ct. at 1735 n. 8; *see also Tarkanian*, 488 U.S. at 197–98 n. 18, 109 S.Ct. at 465 n. 18 (the coordination of amateur sports is "by no means ... a traditional, let alone an exclusive, state function"); *USOC*, 483 U.S. at 544–45, 107 S.Ct. at 2985 (same). Given the Court's reluctance to recognize the full-time management and operation of a park as a traditionally exclusive government function, we cannot conclude that GFI's organization of an annual, day-long Fish Camp Jam qualifies as state action. At bottom, in organizing the Fish Camp Jam, GFI merely "coordinate[s] activities that always have been performed by private entities." *USOC*, 483 U.S. at 544–45, 107 S.Ct. at 2985.[3]

UAW relies principally on *Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), to assert that the provision of "amusement" or "recreation" is an exclusive government function. Appellant's Br. at 15–16. In holding that the private trustees' operation of the public park in *Newton* constituted state action, the Court did say that "[a] park" is an entity that "traditionally serves the community" and that "[m]ass recreation through the use of parks is plainly in the public domain." *Newton*, 382 U.S. at

302, 86 S.Ct. at 490. As noted, however, the Court in *Flagg Bros.* expressed "doubt that *Newton* intended to establish [the] broad doctrine" that "operation of a park for recreational purposes is an exclusively public function." *Flagg Bros.*, 436 U.S. at 159 n. 8, 98 S.Ct. at 1735 n. 8. Rather, the Court explained, *Newton* represented "a finding of ordinary state action under extraordinary circumstances," *id.*, because in that case transfer of the municipal park from public to private hands "had not been shown to have eliminated the actual involvement of the city in the daily maintenance and care of the park," *id.*

*Newton*, in other words, is best understood as a case in which the challenged decisions were imputable to the city because the city remained "entwined in the management or control of the park." *Newton*, 382 U.S. at 301, 86 S.Ct. at 491. Even assuming that the one-day Fish Camp Jam festival could be compared analytically to the ongoing management and operation of a public park, there is no state participation in the Fish Camp Jam comparable to that in *Newton*. UAW does not allege that Gastonia played any role in the festival's management. Nor does it allege that the City played any role in deciding which organizations could occupy festival booths.

### C.

In apparent recognition that the organization of festivals and fairs is not traditionally an exclusive government function, UAW alternatively attempts to redefine the power exercised by GFI in a way that would justify constitutional scrutiny. UAW contends that Gastonia has "ceded control of its town center to [GFI]," Appellant's Br. at 15, and that the City has "turned over the running of its downtown area to a private corporation," *id.* at 19, to such an extent that the downtown

---

**3.** We decline UAW's invitation to remand this case for additional factfinding on whether conduct of an annual festival like the Fish Camp Jam is traditionally and exclusively a government function. Unlike in *Haavistola v. Community Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 218 (4th Cir.1993), where the district court had essentially taken judicial notice that fire protection was not

traditionally an exclusive state function, notwithstanding the Supreme Court's explicit reservation of the question, *see Flagg Bros.*, 436 U.S. at 163–64, 98 S.Ct. at 1737, we do not believe development of a more complete factual record could lead to a different conclusion than that we reach herein.

area is essentially GFI's private property. By characterizing GFI's authority in this way, UAW attempts to come within the ambit of *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), which held that a corporation that operated a privately owned company town was a state actor. This effort is strained at best, even conceding for present purposes that the underlying rationale of *Marsh* could be extended to the context where the property in question is in fact publicly owned.

 The Supreme Court has held that state action can only be found under the authority of *Marsh* where "a private enterprise [assumes] *all* of the attributes of a state-created municipality" and performs "the *full* spectrum of municipal powers." *Hudgens v. NLRB,* 424 U.S. 507, 519, 96 S.Ct. 1029, 1036, 47 L.Ed.2d 196 (1976) (emphasis added). It is not enough to establish state action, contrary to UAW's argument, that facilities be devoted to a "public function," Appellant's Br. at 14 (quoting *Marsh,* 326 U.S. at 506, 66 S.Ct. at 278–79), or that an owner " 'opens up his property for use by the public in general,' " *id.* at 15 (quoting *Marsh,* 326 U.S. at 506, 66 S.Ct. at 278). A private actor must assume plenary control and complete governmental power over the property in question.

 It is plain from the record before us that, while GFI plays a significant role in organizing and directing the entertainment activities in the downtown area during the day-long Fish Camp Jam, GFI has not been afforded and has not otherwise assumed the requisite amount of governmental control over even a single "municipal power," much less sufficient power to qualify as a state actor under *Marsh* and *Hudgens.*

To begin with, the very existence of a permit system for approval of private functions on public property demonstrates that the City of Gastonia, and not GFI, exercises ultimate control over the use of the public property and facilities. The City also provides essential services to support the festival, further confirming that GFI has not assumed plenary control over Gastonia. The Gastonia police department "provides manpower to close down the streets, protection of the site during set up, tear down, and during the festival itself." J.A. at 18. "The City traffic department provides barricades to close the streets, hangs banners and drops electrical cords from supplies on poles." J.A. at 18. The fire department provides water for the event and presumably stands ready to assist should a fire break out. J.A. at 18. There is no evidence in the record that Gastonia has relinquished control over any of these basic functions to GFI during the Fish Camp Jam.[4]

The permits are also replete with conditions that underscore Gastonia's retention of governmental authority. Approval of GFI's noise permit was conditioned on GFI's "compliance with all regulations and ordinances of the City of Gastonia." J.A. at 89. GFI agreed to give "full cooperation to the Gastonia Police Department in enforcing the noise ordinance ... and to be capable of assisting the Gastonia police officers in their enforcement duties." J.A. at 89. The noise permit also notified GFI that "failure to [comply] may result in revocation of this permit and the imposition of a civil penalty." J.A. at 89. Under the terms of the parade permit, the City of Gastonia "reserve[d] the right to reopen the streets at any time," again leaving no doubt that Gastonia retained control of and responsibility for the entire festival area. J.A. at 86.

At the same time that the City of Gastonia has retained the essence of its sovereign power, GFI, in exercising the limited authority that has been conferred upon it, has not sought to assert the full extent of its power. UAW has virtually complete freedom to spread its message in Gastonia; its only restriction is that, on the single day of the year on which GFI holds the Fish Camp Jam, the

4. While reliance on state resources may provide a basis for establishing state action under the so-called "nexus test," the presence of state assistance undermines UAW's claim that GFI has assumed plenary control over downtown Gastonia. Even UAW concedes that, as the case is presently postured, there is an insufficient nexus between GFI and Gastonia to establish state action on that ground, particularly in light of the Supreme Court's treatment of the nexus test in *Jackson, Rendell–Baker, Blum,* and *USOC.*

Local may not obtain a booth to distribute literature in the particular downtown area of Gastonia permitted for use by the festival. Union members may freely distribute their literature and advocate political positions with the patrons of the Fish Camp Jam, or they can seek a permit from Gastonia to hold their own festival celebrating organized labor. UAW is presented with "a far wider number of choices" for disseminating its message in Gastonia than was the "member of Jehovah's Witnesses who wished to distribute literature in Chickasaw, Ala., at the time *Marsh* was decided," a factor the Court has found significant when considering the presence of state action on the authority of *Marsh*. *Flagg Bros.*, 436 U.S. at 162, 98 S.Ct. at 1736.

### III.

That GFI obtains a permit from the City of Gastonia in order to conduct its festival in part on public property does not in any way alter our conclusion that GFI acts solely in a private capacity when it holds the Fish Camp Jam festival. The possession of a permit to perform on public property what are ordinarily private functions does not convert the permit holder into a state actor. *See Jackson*, 419 U.S. at 357, 95 S.Ct. at 456–57 ("Approval by a state utility commission [of a proposed practice by a privately-owned utility], where the commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the commission into 'state action.'"); *USOC*, 483 U.S. at 543, 107 S.Ct. at 2985 ("The fact that Congress granted [USOC] a corporate charter does not render the USOC a Government agent."). We have long adhered to the principle that the actions of a private organization temporarily using public property are not actions that can fairly be attributed to the state. As we observed *en banc* two decades ago, "[t]he state action doctrine has never been thought to extend to cases where the street, parks and public meeting places of a particular community are utilized for the exercise of first amendment rights." *National Socialist White People's Party v. Ringers*, 473 F.2d 1010, 1016 (4th Cir.1973). The principle established in *Ring-*

*ers* ensures that private organizations like GFI that wish to use public property to organize festivals, fairs, rallies, parades, or meetings, are not chilled from doing so by the possibility that they will be subject to liability as if they were agents of the government. *See also NBC v. Communications Workers of Am., AFL–CIO*, 860 F.2d 1022, 1025 (11th Cir.1988) (rejecting the proposition that a private party's "actions constituted state action merely because [it] held its convention in a public building"). Just as in *Ringers*, "[t]he essential point here is not that there is insufficient state action, but simply that the state action doctrine is not applicable where a group seeks to exercise first amendment rights in a public forum dedicated to that purpose." *Ringers*, 473 F.2d at 1017.

UAW argues that in permitting GFI exclusive use of the city's public streets and sidewalks, Gastonia has effectively ceded to GFI the power to regulate speech on the streets and sidewalks of the city. This, UAW urges, is manifestly a public function. *See* Appellant's Reply Br. at 4–5 (citing *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941)). When it permits GFI to use the streets and sidewalks for the Fish Camp Jam, however, Gastonia does not cede to GFI the sovereign power to regulate speech on those streets and sidewalks. That the City must issue the permit and that it retains the authority to revoke it, prove that the City has not ceded its ultimate regulatory powers. The City's award of the permit merely allows GFI to use the streets and sidewalks for the time and purpose of the permit.

In the course of using the streets and sidewalks during the festival, GFI does exercise a power to decide who may operate booths at the Fish Camp Jam, and exercise of this power does have the incidental effect of restricting at least the manner in which UAW members are able to speak in the area of the festival during the day in question. That these purely private decisions have the incidental effect of restricting others in their use of the property, however, does not transform that which is not a traditional and exclusive state function into one that is. If a

party obtaining a permit to use public property for a specific event were constitutionally required to admit unconditionally everyone seeking admission, it would be virtually impossible to hold the event for which the permit was obtained.

Indeed, the Supreme Court rejected an argument indistinguishable in principle from UAW's in *USOC*. There, Congress granted the United States Olympic Committee "the right to prohibit certain commercial and promotional uses of the word 'Olympic' and various Olympic symbols." *USOC*, 483 U.S. at 526, 107 S.Ct. at 2975. The USOC then used that right to terminate an unaffiliated organization's use of the word "Olympic." *Id.* at 527, 107 S.Ct. at 2976. The Court refused to accord the USOC state actor status on the basis of its action, because "[t]he USOC's choice of how to enforce its exclusive right to use the word 'Olympic' simply is not a governmental decision." *Id.* at 547, 107 S.Ct. at 2986; *see also Blum*, 457 U.S. at 1012, 102 S.Ct. at 2789–90 (even if it could be shown that the state was responsible for providing its elderly citizens with nursing home services, "it would not follow that decisions made in the day-to-day administration of a nursing home are the kind of decisions traditionally and exclusively made by the sovereign for and on behalf of the public"). GFI's decision not to offer booth space to UAW is no more state action than was USOC's decision to enforce its exclusive use right against the unaffiliated organization.

### IV.

The consequences of finding state action in this case would be difficult to overstate. Were we to hold that the incidental power to exclude others from public property during the course of a limited, permitted use transformed the permit holder into a state actor, softball teams on the Mall in Washington, D.C. would be constitutionally obliged to afford due process to those not allowed to play on the particular field at the same time. Every family that barbecues at a public park would theoretically be barred from excluding uninvited guests on constitutionally suspect grounds. The local church could no longer use public facilities to hold events for fear of violating the Establishment Clause. Every picnic, wedding, company outing, meeting, rally, and fair held on public grounds would be subject to constitutional scrutiny merely because the organizer had "been granted exclusive use of city facilities ... as well as authority to determine who may use those ... facilities and what they may say while on the public fora." Appellant's Br. at 23.

Ironically, under its proposed rule, even UAW would no longer be able to exclude its own opponents from pro-labor rallies and meetings held on public property. Anti-labor activists would have to be permitted to participate in Labor Day parades, and management would be constitutionally protected against exclusion from union meetings held in publicly owned meeting halls. Realizing the untenability of UAW's proposed rule, the Eleventh Circuit afforded a labor union the very protection that UAW seeks to deny GFI in this case. *See NBC v. Communications Workers of Am., AFL–CIO*, 860 F.2d 1022, 1025–26 (11th Cir.1988) (holding that the AFL–CIO, as a private actor, can constitutionally exclude a media organization with which it had a political difference from the union's annual convention held in a public facility in Miami). The decisions of the Supreme Court and of this circuit are clear that GFI must be afforded the same protection to which the union is entitled.

Because GFI was not subject to liability as a state actor under section 1983 when it held the annual Fish Camp Jam, the proper course was to dismiss UAW's complaint, as the district court did. Accordingly, the judgment of the district court is affirmed.

*AFFIRMED.*