**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————

**No. 16-6625**

———————

WILLIAM B. COX, Personal Representative for the Estate of Robin G. Fleming,

        Plaintiff - Appellant,

and

ROBIN G. FLEMING,

        Plaintiff,

v.

DUKE ENERGY INC.; J.W. BYRD, Darlington County Sheriff; JOYCE C. EVERETT; WILLIAM GIDEON, a/k/a Randy; DARLINGTON COUNTY SHERIFFS OFFICE; GARY STREETT,

        Defendants - Appellees.

———————

Appeal from the United States District Court for the District of South Carolina, at Florence. Bruce H. Hendricks, District Judge. (4:13-cv-01456-BHH)

———————

Argued: September 12, 2017            Decided: November 20, 2017

———————

Before NIEMEYER, DUNCAN, and FLOYD, Circuit Judges.

———————

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Duncan and Judge Floyd joined.

––––––––––––––––––

**ARGUED:** John Adams Hodge, JOHN ADAMS HODGE & ASSOCIATES, LLC, Columbia, South Carolina, for Appellant. Thomas Rush Gottshall, HAYNSWORTH SINKLER BOYD, P.A., Columbia, South Carolina; Samuel F. Arthur, III, AIKEN, BRIDGES, NUNN, ELLIOTT & TYLER, PA, Florence, South Carolina, for Appellees. **ON BRIEF:** Sarah P. Spruill, Joshua D. Spencer, Samuel R.B. Shealy, HAYNSWORTH SINKLER BOYD, P.A., Columbia, South Carolina, for Appellees Duke Energy Inc. and William Gideon.

––––––––––––––––––

NIEMEYER, Circuit Judge:

When Robin Fleming flew his glider plane over the H.B. Robinson Nuclear Plant — operated by Duke Energy Progress, Inc., in Darlington County, South Carolina — and then began circling repeatedly nearby, plant security personnel found the glider's presence suspicious and notified the Darlington County Sheriff's Office, the nearby airport, the Federal Aviation Administration ("FAA"), and Shaw Air Force Base. Responding Sheriff's deputies ordered Fleming to land his glider at the airport and, once he landed, took him into custody, arresting him for misdemeanor breach of the peace. They held him in a cell overnight, advising him that Homeland Security and the FBI were interested in questioning him the next morning. He was released the next day on bond.

Several weeks later, while at court for trial on the breach-of-peace charge, Fleming, with the advice of his attorney, agreed to waive any civil claims that he might have against the Darlington County Sheriff's Office in exchange for dismissal of the charge. Nonetheless, Fleming later commenced this action against Duke Energy, Duke Energy's vice president in charge of the Robinson Nuclear Plant, the Darlington County Sheriff's Office, the Sheriff, and two deputies. Invoking 42 U.S.C. § 1983, he alleged that the defendants had violated his civil rights under color of state law, denying him the "freedom of movement, freedom from arrest and detention, and freedom to conduct a lawful activity," in violation of the Fourth, Fifth, and Fourteenth Amendments. He also alleged state law claims of false imprisonment, false arrest, negligence, and civil conspiracy.

3

The district court granted the defendants' motions for summary judgment, holding (1) that Fleming had validly waived his right to sue the Darlington County Sheriff's Office, the Sheriff, and the deputies; (2) that Duke Energy and its vice president were private actors not operating "under color of" state law as required for liability under § 1983; and (3) that Fleming's remaining state law claims were preempted by federal law's exclusive regulation of nuclear safety.

For the reasons that follow, we affirm.

I

Fleming, a retired aeronautical engineer and experienced glider pilot, set off in his glider from an airfield in Jefferson, South Carolina, on the afternoon of July 26, 2012, from where he was "aerotowed" to an altitude of 2,000 feet and then released. During his flight, Fleming flew over the Robinson Nuclear Plant at an altitude of approximately 1,100 feet and then flew a short distance eastward toward Lake Robinson. Once over the lake but still near the plant, he began to circle repeatedly so as to gain altitude — a mode of flight known as "thermalling."

Security personnel employed by Duke Energy noticed Fleming's glider and grew suspicious, especially of the aircraft's continued circling in the vicinity of the plant. After they put the plant on "heightened awareness," they contacted the Darlington County Sheriff's Office, the Hartsville Regional Airport, the FAA, and Shaw Air Force Base. The Hartsville Airport was unaware of a glider operating in the area, and neither the FAA nor Shaw could locate the aircraft on radar.

The Sheriff's Office dispatched deputies to the airport, who, upon arriving, directed the airport's assistant manager to establish radio contact with the pilot and instruct him to land at the airport. The assistant manager responded that only the FAA had authority to issue such an order. She also spoke by telephone with an FAA employee, who indicated that because the pilot had apparently done nothing wrong, the aircraft could not be ordered to land. The deputies nonetheless told the assistant manager again to order the glider to land, and she accordingly advised the pilot via radio that "the Sheriff wanted [him] to land as soon as possible."

Although Fleming knew that he had not entered any restricted airspace, he landed his plane as directed and was taken into custody by the Sheriff's deputies, who arrested him on a misdemeanor charge for breach of the peace, advising him that the FBI and Homeland Security wanted to interview him the next day. The deputies handcuffed Fleming, placed him in the back of a Sheriff's Office vehicle, and read him his *Miranda* rights. By that time, Duke Energy security personnel had arrived, and they asked Fleming whether he knew that he was flying over a nuclear power plant. Fleming said that he did. Fleming was then taken to a holding cell, where he was kept overnight.

The next morning, Fleming met with his attorney, Gerald Malloy, whom an acquaintance had retained on his behalf. After Malloy departed, Fleming was interviewed by an FBI agent and an investigator from Homeland Security. At the bail hearing that afternoon, Fleming was released on bond, having spent approximately 24 hours in custody.

Several weeks later, on August 21, 2012, Fleming and his attorney Malloy attended court for trial on the breach-of-peace charge. After Fleming had been waiting outside the courtroom for some time, Malloy came out and told him that the only way he could get out of the case was to sign an agreement releasing the Sheriff's Office from civil liability. Fleming at first resisted the proposal because he felt that he had "done nothing wrong." Malloy responded with some agitation, stating that Fleming had made an "incredible mess" that had prompted the "release [of] aircraft," specifically "F-16" fighter jets, from Shaw Air Force Base (a representation that Fleming claims was untrue and that, in any event, is not supported by the record). Although the two discussed — indeed, even argued — about the proposal for approximately 20 minutes, Fleming, after giving "consideration to the alternatives," ultimately became convinced that jurors from the Hartsville community would feel as though the Sheriff's Office acted appropriately to ensure their safety and that he "would have no chance of clearing [his] name." As he explained:

> The reason I [signed the waiver agreement] was that the trial would be held in Hartsville, and I'm sure that the people of Hartsville would say that the nuclear station did the right thing to, you know, have me shot down, if necessary, because they were protecting Hartsville and [its] occupants. And these would be the jury members. And I thought to myself there's no way I'm going to win this case. I'll lose the case, pay a fine, have a criminal record. And I took those . . . things into consideration. I said this is the best option.

After Fleming agreed to the proposal, Malloy instructed Fleming to draft a release himself using "whatever language [he] desired," and Fleming handwrote a two-sentence paragraph stating that he "accept[ed] dismissal of the subject breach of peace [charge]

6

against [him]" and "agree[d] that no legal action will be taken against Darlington County law enforcement now, or in the future." After Fleming signed the document, Malloy presented it to the Sheriff's representatives in court, and the breach-of-peace charge was dismissed.

Some nine months later, on May 11, 2013, Fleming commenced this action in state court against the Darlington County Sheriff and a deputy, as well as Duke Energy and its vice president, and the defendants removed the case to federal court. Then, in July 2013, Fleming passed away from cancer, and his personal representative, William B. Cox, was substituted as the plaintiff in October 2013. Cox filed an amended complaint adding as defendants the Darlington County Sheriff's Office and another Sheriff's deputy.

On motions filed by the defendants, the district court granted summary judgment to all defendants. The court concluded first that none of the claims against the Darlington County Sheriff's Office, the Sheriff, and the deputies could proceed "because Mr. Fleming [had] executed a valid waiver of his rights to sue them in connection with his arrest." In doing so, the court assessed the validity of the waiver under the factors identified in *Town of Newton v. Rumery*, 480 U.S. 386 (1987), and *Rodriguez v. Smithfield Packing Co.*, 338 F.3d 348 (4th Cir. 2003). The court next concluded that Duke Energy and its vice president could not be held liable under § 1983 because they were private actors who were not operating "under color of" state law and they "were not responsible for the state's actions in ordering Mr. Fleming to land, arresting him, and charging him with breach of the peace." The court noted also that they had a duty under *federal* law "to report any suspicious activity in the area around the Plant to specified

7

federal authorities and local law enforcement" and that it would thus "not be appropriate" to treat their conduct as "state action." Finally, the court dismissed Fleming's state law claims against Duke Energy and its vice president, concluding those claims were preempted by federal law's exclusive regulation of nuclear safety because the claims "would have a direct and substantial effect on security decisions concerning radiological safety levels by those charged with operating nuclear facilities." In reaching this conclusion, the court cited to U.S. Nuclear Regulatory Commission directives for reporting security threats, finding that Duke Energy had "followed the applicable guidance" in those directives.

From the district court's judgment dated March 31, 2016, Fleming's estate (hereafter, "Fleming") filed this appeal.

II

Our review of a summary judgment is *de novo*, and we construe inferences that may be drawn from the underlying facts "in the light most favorable to the party opposing the [summary judgment] motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Fleming contends first that he did not *voluntarily* waive his civil claims against the Sheriff's Office, the Sheriff, and the deputies, claiming that he only had a short time to consider the waiver agreement and was under duress at the time. He asserts further that his attorney fed him "misinformation" and "browbeat[]" him into signing. Finally, he argues that the Sheriff's Office was pursuing "illegitimate charges" against him for the

purpose of avoiding civil liability and thus his waiver was the product of prosecutorial misconduct.

The Sheriff's Office defendants contend, on the other hand, that the record incontrovertibly demonstrated the validity of Fleming's waiver agreement and that the district court properly concluded, after applying the relevant factors from *Rumery*, that the agreement was valid and enforceable.

In *Rumery*, the Supreme Court rejected the argument that release-dismissal agreements are "inherently coercive" because they unfairly "present a criminal defendant with a choice between facing criminal charges and waiving his right to sue under § 1983." 480 U.S. at 393. In enforcing the agreement before it, the Court held that review of such agreements must be conducted on a case-by-case basis and that such an agreement is enforceable, provided that it was "voluntary," it did not involve "prosecutorial misconduct," and it "would not adversely affect the relevant public interests." *Id*. at 398; *see also id*. at 401 (O'Connor, J., concurring). In supplying the Court's fifth vote, Justice O'Connor noted that "[m]any factors" might bear on whether a release-dismissal agreement is voluntary and not the product of prosecutorial overreaching:

> The knowledge and experience of the criminal defendant and the circumstances of the execution of the release, including, importantly, whether the defendant was counseled, are clearly relevant. The nature of the criminal charges that are pending is also important, for the greater the charge, the greater the coercive effect. The existence of a legitimate criminal justice objective for obtaining the release will support its validity. And, importantly, the possibility of abuse is clearly mitigated if the release-dismissal agreement is executed under judicial supervision.

9

*Id.* at 401–02; *see also Rodriguez*, 338 F.3d at 353.

Applying the *Rumery* principles here, we reject Fleming's arguments that his execution of the waiver agreement was not voluntary and that the Sheriff's prosecution of him amounted to prosecutorial misconduct.

As to voluntariness, the record shows that during his entire consideration of whether to sign the agreement, Fleming was represented by counsel, Gerald Malloy, who was acting exclusively in Fleming's best interest. Indeed, it is undisputed that when Fleming and Malloy went to court, it was Malloy who initially conceived of the agreement. According to the Sheriff, after Malloy met with Fleming outside the courtroom and before trial, Malloy provided the Sheriff's representatives with the proposed release-dismissal agreement. As the Sheriff stated, his Office did not suggest or demand the waiver and was prepared to proceed with trial on the charge against Fleming.

While the record indicates that Malloy advised Fleming to enter into the release-dismissal agreement, it also shows that Malloy made sure that Fleming understood his right to go to trial. Their discussion was relatively brief, lasting approximately 20 minutes, but Fleming never indicated that he needed more time to make the decision. To the contrary, he recounted that during the discussion, he considered his alternatives and ultimately resolved that executing the waiver agreement was in his best interest. He stated further that while he continued to maintain that he had done nothing wrong, he also believed that he would probably lose the case if he exercised his right to go to trial, resulting in a fine and a criminal record, because he was "sure that the people of Hartsville would say that the nuclear station did the right thing to . . . protect[] Hartsville

10

and [its] occupants." Fleming summarized that he took all of these things "into consideration" and concluded that signing the waiver was "the best option."

Not only is there no indication in the record that the time Fleming had to consider the proposal was insufficient, there is also no evidence of pressure from the opposing side. Rather, Fleming was alone with his attorney when he reached his decision. And it is further worth noting that Fleming, who was mature and educated, wrote the waiver in his own hand using his own language.

Fleming contends nonetheless that the agreement should be set aside because Malloy fed him "misinformation" and pressured him into signing the release. To be sure, we must assume at this stage of the case that Malloy misinformed Fleming about the scrambling of F-16s to drive home his point that Fleming had made a "mess." But it is clear that such a misrepresentation — if made — regarding the gravity of the situation caused by Fleming's glider flight could not have made his decision to sign the agreement involuntary. Fleming stated that before he took flight, he was aware that the FAA had instructed pilots to avoid circling near nuclear facilities and that this instruction had been prompted by 9/11 — when airplanes were used as tools of terrorism. In addition, he testified that once he had been arrested, he learned that his glider flight had prompted the interest of both the FBI and Homeland Security.

Fleming also continues to maintain that the agreement was unenforceable because he did not have adequate time to consider it and thus was unduly pressured to make the decision to waive his rights, being faced with an imminent trial on the misdemeanor charge. He now characterizes that pressure as duress. But if he considered the

11

imminence of trial to have placed undue pressure on him, he and his lawyer could have requested more time to consider the proposal or could have asked for a postponement. They did neither; indeed, the subject never entered the discussions. Rather, all the evidence indicates that after discussing the options with Malloy, Fleming made a free and reasoned choice, one he himself characterized as the best choice available. Moreover, after signing the waiver, Fleming waited outside the courtroom for a half hour before he was advised that the case was dismissed, a time during which he could have reflected further and changed his mind. But he never did.

Relying on *Rumery*, Fleming also contends that prosecutorial misconduct was involved, arguing that the Sheriff's Office knew that the warrant for his arrest was "invalid on its face" and that the Office "mistakenly" held him "in anticipation of forthcoming Federal charges." But that argument addresses the circumstances of Fleming's arrest and detention, not the conduct of the Sheriff's Office in accepting the release-dismissal agreement. Indeed, the record is undisputed that the Sheriff and his deputies subjectively believed that the charge was legitimate, and there is simply no indication that anyone attempted to use the charge to extract a waiver from Fleming. To the contrary, the fact that the agreement was initially suggested by Malloy, as opposed to any Darlington County official, strongly indicates that it was "not the product of prosecutorial overreaching." *Rumery*, 480 U.S. at 401 (O'Connor, J., concurring); *see also Rodriguez*, 338 F.3d at 353.

In sum, because the record indicates that Fleming's execution of the waiver was both voluntary and not the product of prosecutorial misconduct, we conclude that the

12

district court did not err in determining that the release-dismissal agreement was enforceable.

## III

Fleming next contends that the district court erred in concluding that Duke Energy and its vice president did not act "under color of" state law and therefore that they could not be held liable under § 1983.

Section 1983 provides, in relevant part, "Every person who, *under color of any statute, ordinance, regulation, custom, or usage, of any State* . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983 (emphasis added). Thus, in order to be liable to Fleming for the alleged violations of his constitutional rights, Duke Energy and its vice president would have to be persons acting "under color of" state law. *See Wahi v. Charleston Area Medical Center, Inc.*, 562 F.3d 599, 615–16 (4th Cir. 2009). "[M]erely private conduct, no matter how discriminatory or wrongful," is excluded from the reach of § 1983. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)). Stated otherwise, to be sued under § 1983, a defendant "must either be a state actor or have a sufficiently close relationship with state actors such that a court would conclude that [it] is engaged in the state's actions." *DeBauche v. Trani*, 191 F.3d 499, 506 (4th Cir. 1999); *see also Wahi*, 562 F.3d at 616 (explaining that a private entity's activity is generally not actionable

under § 1983 "unless the state has so dominated such activity as to convert it to state action") (quoting *DeBauche*, 191 F.3d at 507).  To be sure, when a private party exercises sovereign power conferred on it by a government, the private party may be subject to § 1983 liability, *see United Auto Workers Local No. 5285 v. Gaston Festivals, Inc.*, 43 F.3d 902, 906 (4th Cir. 1995), but a State's "'[m]ere approval of or acquiescence in the initiatives of a private party' is insufficient," *DeBauche*, 191 F.3d at 507 (quoting *Blum*, 457 U.S. at 1004).  In short, to be liable under § 1983, a party must be one "who may fairly be said to be a state actor," *Am. Mfrs. Mut. Ins.*, 526 U.S. at 50 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)), such that "the allegedly unconstitutional conduct is fairly attributable to the State," *id.*

In this case, Fleming acknowledges that Duke Energy and its vice president are private actors who ordinarily would not be liable under § 1983.  He maintains, however, that through their conduct in connection with the events in this case, they "act[ed] in a quasi-governmental capacity" and thereby "contributed to the deprivation of [his] constitutional rights."  The district court rejected that argument, noting that on the day in question, Duke Energy and its personnel simply functioned as private actors assisting law enforcement, as any private actor would.  We agree.

The record shows that Duke Energy's security personnel reported the presence of Fleming's glider to the Sheriff's Office shortly after observing it fly over and circle near the Robinson Nuclear Plant.  Those personnel also provided the Sheriff's Office with the glider's "tail number."  Thereafter, Duke Energy dispatched members of its security team to the Hartsville Airport, where one employee viewed the inside of Fleming's glider and

14

photographed it. Once Fleming had been taken into custody, a Sheriff's deputy asked Fleming whether he would answer questions from two Duke Energy employees. Fleming stated that "it depended on what the questions were." The Duke Energy personnel then proceeded to ask Fleming a single question — whether he knew that the facility he had flown over was a nuclear plant, to which Fleming responded that he did.

Fleming argues that when Duke Energy provided law enforcement with misinformation about the height at which the glider was flying (allegedly reporting that it flew at 100 feet above the plant) and the fact that the plant was in a restricted area or a "no-fly zone," it contributed to the deprivation of his constitutional rights by the Sheriff's Office. But as the record makes clear, Fleming's arrest and detention were effected only by the Sheriff's Office, not by Duke Energy or due to any request made by Duke Energy. Moreover, Fleming's allegation that Duke Energy employees provided misinformation does not make the employees state actors, any more than would a witness's erroneous report to police of the license number of a vehicle fleeing a bank robbery.

Fleming also argues that when Duke Energy's employees questioned him at the airport, the company was "act[ing] in a quasi-governmental capacity," thus subjecting it to § 1983 liability. Yet, Fleming makes no showing that the Duke Energy employees questioned him pursuant to a governmental request or for any governmental purpose. Duke Energy had its own interest in the security of its plant, and obtaining information about a person who had flown near the plant was important to that interest.

15

Finally, Fleming contends that an internal email prepared by Duke Energy personnel demonstrates that Duke Energy was "integrally involved" in the Sherriff's Office's decisions to arrest and charge Fleming. The email stated:

> The control room was contacted by Security personnel regarding an unidentified airborne craft in the area near the plant. Further investigation and monitoring identified the craft as a glider. The tail number has been obtained by a security officer stationed in one of the BRE towers. This information has been forwarded to Darlington County Law enforcement to assist in determining the crafts origin in an effort to capture and detain the individual for further questioning. The individual has been apprehended at the Hartsville Airport by local law enforcement personnel.

This email, however, indicates no more than the fact that Duke Energy was attempting to assist law enforcement in their efforts in connection with the incident. It does not, as Fleming argues, suggest that Duke Energy demanded or participated in the Sheriff's decision to arrest and charge Fleming. And, even if it did, a request to arrest someone apparently posing a risk to a nuclear plant does not make the requester a state actor. The record remains uncontroverted that the Sheriff's Office made all of the decisions of which Fleming complains — demanding that Fleming land at the airport, charging him with a misdemeanor offense, and arresting and detaining him pending questioning by the FBI and Homeland Security. Duke Energy participated in none of these decisions.

At bottom, there is no evidence that Duke Energy had the requisite relationship to the Sheriff's Office so as to convert its conduct into state action, *see DeBauche*, 191 F.3d at 506–07, and the district court correctly concluded therefore that Fleming failed to state a claim against Duke Energy and its vice president under § 1983.

## IV

Finally, Fleming contends that the district court erred in concluding that his state law claims against Duke Energy and its vice president were preempted by federal law. The gravamen of those claims is (1) that the Duke Energy defendants acted negligently when they deemed Fleming's glider flight to be suspicious and then conveyed inaccurate information to law enforcement about the glider's movements and the restrictions on the airspace above the plant; and (2) that this negligence was a but-for cause of Fleming's false arrest and imprisonment by the Darlington County Sheriff's Office. Thus, these state law claims would succeed or fail based on the reasonableness *vel non* of the Duke Energy defendants' conduct in communicating to law enforcement officers the security threat that they perceived.

The district court held that these state law claims were preempted by federal law because the conduct supporting the claims fell within a field that Congress intended for the federal government to occupy exclusively. Specifically, the court noted that Fleming's claims implicated "the ability of officials at nuclear facilities to assess activity in the airspace around a facility, to evaluate whether that activity is suspicious or concerning, to report that activity to federal and local law enforcement, and to follow-up to determine what, if any, risk was or is posed to the facility by the activity." It stated that these are matters "upon which federal regulators have provided very specific guidance" — referring to several Nuclear Regulatory Commission directives regarding the reporting of security threats — and that "the Duke [Energy] defendants followed the applicable guidance" when they reported Fleming's glider flight to the Sheriff's Office.

17

Accordingly, the court concluded, to hold the Duke Energy defendants liable for their allegedly negligent response to a perceived security threat "would have a direct and substantial impact on judgments that Congress intended these operators to make exclusively in accordance with guidance from federal authorities."

Federal preemption of state law under the Supremacy Clause — including state causes of action — is "fundamentally . . . a question of congressional intent." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). The Supreme Court has recognized that there are three ways by which Congress manifests that intent: (1) when Congress explicitly defines the extent to which its enactment preempts state law (express preemption); (2) when state law "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively" (field preemption); and (3) when state law "actually conflicts with federal law" (conflict preemption). *Id*. at 78–79. In this case, the district court relied on field preemption.

Beginning in the 1940s with the development and first use of atomic power for energy and continuing up to the enactment of the Atomic Energy Act of 1954, the "use, control and ownership of nuclear technology remained a federal monopoly." *Pacific Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 206 (1983). But with the Atomic Energy Act, Congress authorized licensing for the private construction and operation of commercial nuclear power reactors, and it ultimately gave the Nuclear Regulatory Commission — the successor to the Atomic Energy Commission — the authority over the licensing of nuclear facilities. The Commission's "prime area of concern" in exercising this authority was to ensure the "national security, public

18

health, and safety." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 550 (1978) (citing 42 U.S.C. §§ 2132–33, 2201). At the same time, Congress gave authority to the States over the economic considerations concerning the construction and operation of nuclear plants, as well as regulation of the energy produced. *See Pacific Gas*, 461 U.S. at 206–07. The Supreme Court thus summarized:

> [T]he Federal Government maintains complete control of the safety and "nuclear" aspects of energy generation; the States exercise their traditional authority over the need for additional generating capacity, the type of generating facilities to be licensed, land use, ratemaking, and the like.

*Id*. at 212.

Based on these actions by Congress, the Supreme Court in *Pacific Gas* concluded that "the Federal Government has occupied the *entire field of nuclear safety concerns*, except the limited powers expressly ceded to the States," such that "safety regulation of nuclear plants by States is forbidden." *Id*. (emphasis added). And the Court subsequently reiterated this conclusion in other cases regarding nuclear field preemption. *See Silkwood v. Kerr-McGee*, 464 U.S. 238, 249 (1984); *English*, 496 U.S. at 82. Moreover, it explained further that state law causes of action are subject to field preemption when they "have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." *English*, 496 U.S. at 85.

In this case, the Duke Energy defendants were sued because they allegedly acted negligently when they deemed Fleming's glider to be suspicious and then conveyed inaccurate information to law enforcement about the glider's movements, as well as the

19

restrictions on the airspace above the plant. Fleming asserts that the Duke Energy defendants' negligent reporting was the but-for cause of his false arrest and imprisonment by the Darlington County Sheriff's Office. But Duke Energy's conduct, even if tortious, was responsive to the safety concerns governed exclusively by federal law, *see Pacific Gas*, 461 U.S. at 212, and imposing liability based on such claims would have a "direct and substantial effect" on decisions designed to ensure the facility's safety, *English*, 496 U.S. at 85. Duke Energy's suspicions reflected the risks posed by an unidentified plane with an unknown purpose circling near a nuclear facility. Among others, those risks included an intentional impact with the facility and the resulting release of radiation or possible surveillance in furtherance of a terrorist plot — especially salient threats in the aftermath of 9/11. Until such legitimate suspicions were allayed, ultimately here through the questioning by the FBI and Homeland Security, the entire incident implicated the very nuclear safety concerns at the core of the field preempted by federal law. *See Pacific Gas*, 461 U.S. at 212.

Moreover, subjecting the operators of nuclear facilities to tort liability for harms like those suffered by Fleming — *i.e.*, harms inflicted by law enforcement officers responding to reports of security threats — would obviously affect the operators' decisionmaking regarding the reporting of threats. Here, for example, Fleming alleged that Duke Energy provided inaccurate or incomplete information to the Sheriff's Office. The prospect of state damage awards resulting from such reports could cause a company such as Duke Energy to be hesitant to inform the authorities when confronted with an indeterminate phenomenon potentially implicating its security, especially when the

20

company lacks the ability to control how law enforcement might respond to its report. And such hesitation could thus compromise the responsibility of reporting threats promptly before it becomes too late for the government to respond — a concern that is substantially magnified in the context of maintaining the integrity of a nuclear reactor and its attendant facilities.

A conclusion that Fleming's state tort claims fall within the preempted field of nuclear safety is further supported by several express directives issued by federal agencies. For one, the FAA had issued a "Special Notice," which, "in the interests of national security," advised pilots "to avoid the airspace above, or in proximity to [nuclear] sites" and stated further that "pilots should not circle as to loiter in the vicinity over these types of facilities." FAA National Flight Data Center, Special Notice 4-0811. And in a similar vein, the Nuclear Regulatory Commission had instructed nuclear facility operators, as the district court noted without revealing specifics because of security concerns, to report a flight they considered suspicious. *See* NRC Advisory 1A-06-05 (Dec. 8, 2006) (under seal in this case). While we recognize that these directives may also support a finding of conflict preemption, we need not decide that question because Congress has already preempted the entire field of nuclear safety, and the instructions in these directives make clear that the concerns prompting Duke Energy to report Fleming's presence to law enforcement were at the heart of that field.

We thus agree with the district court that Fleming's state law claims against the Duke Energy defendants fell within the field preempted by federal law.

21

Fleming nonetheless argues that his claims are not barred by field preemption because they are similar in kind to those in *Silkwood* and *English*, where the Supreme Court held that the claims before it did not fall within the preempted field. A careful reading of those cases, however, reveals important distinguishing aspects regarding the specific claims at issue before the Court — in *Silkwood*, a claim for damages based on radiological harms caused by a nuclear accident, and in *English*, a retaliation claim against a nuclear facility company that had allegedly punished an employee for reporting safety violations. In *Silkwood*, the Court's holding that field preemption did not apply to state law causes of action "insofar as damages for radiation injuries [were] concerned," 464 U.S. at 256, was based substantially on the existence of legislative history indicating that Congress, in amending the Atomic Energy Act, had specifically "assumed that persons injured by nuclear accidents were free to utilize existing state tort law remedies," *id*. at 251–52 (citing S. Rep. No. 85-296, at 9 (1957)). Relatedly, in *English*, the Court reasoned that it would be "odd, if not irrational," for Congress to have preempted retaliation claims by those reporting safety violations at nuclear facilities given its intention to allow tort actions for radiological harms arising from such violations as recognized in *Silkwood*. *See English*, 496 U.S. at 86.

But the case before us does not involve injuries to individuals caused by radiation damage or retaliation against an employee for reporting safety violations. Rather, it involves the actions of a nuclear facility operator taken to ensure the facility's safety by reporting a threat it perceived from an unidentified aircraft circling nearby. Unlike the claims in *English* or *Silkwood*, it is clear that the claims here are ones that Congress

22

intended to include within the preempted field of nuclear safety. As we have explained, Fleming's claims — which seek to apply state tort law to regulate the good-faith reporting of security threats to nuclear facilities — would have a "direct and substantial effect" on the safety-related decisions of those who operate such facilities. *English*, 496 U.S. at 85. Accordingly, we conclude that those claims are preempted.

\*      \*      \*

For the reasons given, we affirm the judgment of the district court.

AFFIRMED